**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GEUNITA M. HINKLE, Administratrix
of the Estate of Bea Wilson,
deceased, as Administratrix, and on
her own behalf; PATRICIA L. WILSON,
individually and for John Wilson
and Adam Wilson, minor children,
who sue by their mother and best
friend; BEA WILSON, JR.; HAROLD W.
WILSON; MILDRED J. WILSON;
HAROLD R. WILSON; GLORIA J.
NORMAN,
Plaintiffs-Appellants,

v.

THE CITY OF CLARKSBURG, WEST

VIRGINIA; DAN BOROFF, individually
and as The City Manager of the
City of Clarksburg; CITY OF
CLARKSBURG POLICE DEPARTMENT;
THOMAS C. DURRETT, individually,
and as Chief of Clarksburg Police
Department; L. L. LAKE, a/k/a
Lanny Lake, individually and as a
Clarksburg City Police Officer;
JOHN WALKER, individually and as a
Clarksburg Police Officer and
Supervisory Officer; RONALD
ALONSO, individually and as a
Clarksburg City Police Officer;

No. 94-1925

CLIFFORD FLOYD, individually and as a Clarksburg City Police Officer and Supervisory Officer; GRANT SMITH, individually and as a Clarksburg City Police Officer; MARK WAGGAMON, individually and as a Clarksburg City Police Officer; GARY LOWTHER, individually and as a Clarksburg City Police Officer, Supervisory Officer and Training Officer; ROBERT STARKEY, individually and as a Clarksburg City Police Officer and Training Officer; LARRY ROBEY, individually and as a Clarksburg City Police Officer and Training Officer; RAYMOND MAZZA, individually and as a Clarksburg City Police Officer and Training Officer; CHARLES REICH, individually and as a Clarksburg City Police Officer and Training Officer; JAMES WATKINS, individually and as a Clarksburg City Police Officer and Training Officer; MICHAEL BROWN, individually and as a Clarksburg City Police Officer and Police Firearms Instructor; JOSEPH K. LUZADER, individually and as a Clarksburg City Police Officer and Firearms Instructor;

2

JOHN DOE; RICHARD ROE; DONALD DOE; ROBERT ROE, Police Officers, Police Supervisory Officers, Police Training Officers and Police Firearms Instructors of the City of Clarksburg Police Department, the identity and number of whom is presently unknown to the plaintiffs, individually and in their official capacities; IRVIN SOPHER, M.D., individually and as The Chief Medical Examiner of The State of West Virginia Office of Medical Examinations; JAMES L. FROST, M.D., individually and as the Deputy Chief Medical Examiner of the State of West Virginia Office of Medical Examinations, Defendants-Appellees.

Appeal from the United States District Court for the District of West Virginia, at Clarksburg. Frederick P. Stamp, Jr., District Judge. (CA-91-64-C(S))

Argued: December 7, 1995

Decided: April 17, 1996

Before WILKINSON, Chief Judge, and RUSSELL and NIEMEYER, Circuit Judges.

_____

Affirmed by published opinion. Judge Russell wrote the opinion, in which Chief Judge Wilkinson and Judge Niemeyer joined.

_____

3

**COUNSEL**

**ARGUED:** Rocco E. Mazzei, Clarksburg, West Virginia, for Appellants. Daniel C. Cooper, STEPTOE & JOHNSON, Clarksburg, West Virginia, for Appellees. **ON BRIEF:** Amy M. Smith, Timothy R. Miley, STEPTOE & JOHNSON, Clarksburg, West Virginia, for Appellees.

_____

**OPINION**

RUSSELL, Circuit Judge:

Bea Wilson was shot and killed by Clarksburg, West Virginia Police Officer Lake after a ten-minute standoff during which Wilson, who was intoxicated and armed with a shotgun, locked himself in his apartment and threatened to kill anyone who came through the door. Wilson's estate and family filed this civil rights suit against the City of Clarksburg and numerous police officers and government officials contending, inter alia, that Officer Lake used excessive force when he killed Wilson, and that the police officers subsequently conspired with government officials to cover-up the wrongdoing.

Appellants, Wilson's estate and family, filed this appeal from the district court's order entering judgment against them upon a partial grant of summary judgment and a jury verdict in their civil action. Finding no reversible error, we affirm the judgment of the district court.

I.

In the early morning hours of January 25, 1990, Clarksburg police officers responded to a domestic violence call at Bea Wilson's apartment. Wilson was intoxicated and inside his apartment with his young son, Adam. Wilson armed himself with a shotgun and ammunition and threatened to kill anyone who came through the door. The officers took up position outside the apartment: Officer Alonso stood just outside the closed apartment door, while Officer Lake manned the stairs leading upstairs and Officer Smith covered the stair-landing

4

near the front door of the building. Officer Floyd arrived at the scene and remained on the porch of the building. Officer Alonso attempted to negotiate with Wilson, who responded by allowing Adam to leave the apartment.

Because the apartment door remained partially open after Adam exited, Officer Lake could see Wilson in the apartment with the shotgun. When Wilson requested to speak with his wife, Officer Alonso told him that his wife was near the front door and would speak to him.

The dispute over what happened next forms the basis for this appeal. Appellants contend that Officer Lake unjustifiably fired a fatal bullet into Wilson's back. The police officers offer a different version, contending that Wilson began moving toward the open door with his right hand extended on the barrel of the shotgun holding several shells, while his left hand was on the trigger. As Wilson reached the threshold with his gun, Officer Lake ordered Wilson to stop and drop the gun. Wilson stopped walking toward the door, but he failed to drop his gun. Officer Lake again commanded Wilson to drop the gun; Wilson raised the shotgun as if to shoot, at which point Officer Lake fired one shot that grazed Wilson's arm, entered his chest, and exited his back. Wilson spun around from the force of the blow, and he fired his shotgun into a stuffed chair in the back of the room. Wilson fell face first away from the door; he was pronounced dead at the scene.

When Dr. Saoud, the County Coroner, arrived at the apartment, he initially noted that Wilson died from a bullet wound to the back. Doctor Saoud based this conclusion on the relative sizes of the wounds. He noted the chest wound was larger than the back wound, which normally indicates that the chest wound is an exit wound. Doctor Frost, the Deputy Chief Medical Examiner, performed an autopsy and concluded that Wilson was shot in the chest. Doctor Frost based his conclusion, in part, on an examination of the fibers from Wilson's sweatshirt. Fibers surrounding the bullet hole on the front of the shirt were facing inward, while those on the back faced outward. According to Dr. Frost, the chest wound was relatively larger than the back wound because the bullet first grazed Wilson's arm, which interrupted its angle such that it did not hit Wilson's chest straight on.

Six days after the shooting, Officer Walker, the chief investigating officer for this shooting, removed Wilson's sweatshirt from the prop-

5

erty room and threw it away in the city dumpster. Officer Walker contends the sweatshirt was covered with blood and was beginning to emit a foul-smelling odor. Although the sweatshirt was evidence of whether Wilson was shot in the chest or back, Officer Walker saw no reason to keep it.

Approximately seven months later, Appellants obtained a court order to exhume Wilson's body. Appellants hired Dr. Wecht, an independent medical examiner, to conduct a second autopsy and reach a conclusion about whether Wilson was shot in the chest or back. Doctor Wecht was unable to examine the chest wound, however, because the entire wound had been excised. Doctor Wecht testified that the chest wound was "obliterated by a puckered incision, . . . , closed tightly by thick, white string." Nonetheless, Dr. Wecht opined that Wilson was shot in the back.

Appellants' lawsuit alleged a state claim for wrongful death, and various complaints of civil rights deprivations under 42 U.S.C. §§ 1983, 1985 & 1986 (1988). Appellants contended that Officer Lake used excessive force against Wilson, that city, county, and state officials subsequently conspired to cover-up the truth and prevent Appellants from seeking redress in a court of law, and that the state medical examiner violated Appellants' due process rights by disposing of Wilson's internal organs without first notifying the family. Appellants also contended Officer Floyd was directly liable for the shooting under a theory of supervisory liability, that the non-shooting scene officers were liable, and that the City of Clarksburg ("the City") was independently liable for providing its officers inadequate training.

The district court dismissed most of Appellants' claims at summary judgment, concluding that Appellants failed to establish a genuine dispute of material fact concerning the existence of a conspiracy to obstruct justice, potential supervisor liability, or the inadequacy of the departmental training program. Appellants' claims of excessive force and wrongful death proceeded to trial. The jury returned a verdict against Appellants on both counts; this appeal followed.

II.

We first consider Appellants' claims that the district court incorrectly granted summary judgment on their claims of non-shooting

officer liability, supervisory liability, inadequate training, conspiracy and denial of due process.

## A. Non-shooting officer liability, supervisory liability and inadequate training

Appellants contend the non-shooting officers at the scene were independently liable for failing to prevent Officer Lake's use of excessive force. Complementary to this claim were Appellants' contentions that the City was liable for providing its officers with inadequate training to handle the type of domestic situation they encountered at Wilson's apartment, and that Officer Floyd was liable as an acting supervisor at the scene.

We see no need to address the merits of these claims because all are derivative of Appellants' claim that Officer Lake used excessive force against Wilson, which was rejected by a jury. In the absence of any underlying use of excessive force against Wilson, liability cannot be placed on either the non-shooting officers, a supervisor, or the City. See McLenagan v. Karnes, 27 F.3d 1002, 1008 (4th Cir.) (no general right to be protected from violence, but even if non-shooting officer's action or failure to act contributed to use of force, issue of liability mooted by finding that shooting officer did not use constitutionally excessive force), cert. denied, 115 S. Ct. 581 (1994); Temkin v. Frederick County Comm'rs, 945 F.2d 716, 724 (4th Cir. 1991) (holding that a claim of inadequate training cannot be established under § 1983 absent a finding of a constitutional violation by the person being supervised), cert. denied, 502 U.S. 1095 (1992). We, therefore, hold that the propriety of the district court's grant of summary judgment on these claims was mooted by the jury's verdict in favor of Officer Lake.

## B. Civil conspiracy

Appellants contend the district court erred in dismissing their claim of civil conspiracy. Appellants claim the police and other government officials participated in a conspiracy to deny their access to the courts under 42 U.S.C. §§ 1983, 1985 & 1986. Unlike the above claims dismissed at summary judgment, this claim is not mooted by the mere fact Officer Lake was found not liable for using excessive force

7

against Wilson; Appellees could have conspired to deny Appellants access to the courts even though Wilson was not the victim of excessive force.

We review the district court's grant of summary judgment de novo. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc), cert. denied, 498 U.S. 1109 (1991). To prevail on a motion for summary judgment, the moving party must demonstrate the absence of a genuine issue of any material fact such that the party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, we construe all facts and reasonable inferences drawn therefrom in favor of the non-moving party. The non-moving party may not rest on their pleadings alone, but must show that specific, material facts exist that give rise to a genuine triable issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party may not "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)). Thus, summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove. See Celotex Corp. v. Catrett, 477 U.S. at 322.

To establish a civil conspiracy under § 1983, Appellants must present evidence that the Appellees acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Appellants' deprivation of a constitutional right (in this case the right to access the courts). See Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1992).

To satisfy their burden of proof, Appellants contend the Appellees disposed of evidence probative on the issue of whether Wilson was shot in the chest or the back. For instance, Appellants point to the fact that Officer Walker inexplicably disposed of Wilson's sweatshirt and that Wilson's chest wound was mysteriously excised from his body. Add to this other facts, such as Dr. Saoud's initial conclusion at the scene that Wilson was shot in the back, and Appellants contend the

8

only reasonable inference is that the Appellees have conspired to cover up Officer Lake's use of excessive force.

We disagree with the inferences Appellants ask this court to draw. Appellants have a weighty burden to establish a civil rights conspiracy. While they need not produce direct evidence of a meeting of the minds, Appellants must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. See Hafner v. Brown , 983 F.2d at 576-77; Abercrombie v. City of Catoosa, Okl, 896 F.2d 1228, 1230-31 (10th Cir. 1990); Fonda v. Gray, 707 F.2d 435, 438 (9th Cir. 1983). In other words, to survive a properly supported summary judgment motion, Appellants' evidence must, at least, reasonably lead to the inference that Appellees positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

Appellants' evidence failed in this regard. Appellants did not produce any evidence, either direct or circumstantial, that Appellees acted in concert to obstruct Appellants' access to the courts. Appellants' evidence did not disclose any communication between Officer Walker, Officer Lake, Dr. Saoud, Dr. Frost or others that might give rise to an inference of an agreement to commit any acts, wrongful, or otherwise. Nor does Appellants' evidence give rise to an inference that each alleged conspirator shared the same conspiratorial objective. The problem with Appellants' evidence is not merely that each act alleged is capable of an innocent interpretation. Rather, the problem is that Appellants' evidence amounts to nothing more than rank speculation and conjecture. It does not reveal that any member of this alleged conspiracy possessed an intent to commit an unlawful objective.

For instance, Appellants speculate that Officer Walker disposed of Wilson's sweatshirt in furtherance of this conspiracy. Yet, Appellants offer no evidence, other than the act itself, that Officer Walker intended to further a conspiratorial objective. Rather, the undisputed evidence before the district court was that Officer Walker disposed of the sweatshirt because it was bloody and beginning to emit a foul-smelling odor and he thought the investigation over the shooting had concluded.[1] Similarly, the fact that Dr. Saoud initially thought Wilson

---

[1] While we do not find Officer Walker's conduct probative of his participation in a conspiracy, we do not sanction his disposal of highly probative evidence.

9

was shot in the back when he examined the body at the scene, while Dr. Frost later confirmed the officers' version of the events after performing an autopsy, is not probative of the existence of a conspiracy or their participation therein. Again, the undisputed evidence was that Dr. Saoud initially thought Wilson was shot in the back because of the relative size of the wounds--the chest wound was larger than the back wound, a fact consistent with the back wound being the entrance wound. Upon conducting an autopsy, however, it was clear that the bullet first grazed Wilson's arm, thereby altering the trajectory and spin of the bullet, causing it to do more physical damage when it entered Wilson's chest than would have occurred under normal circumstances. Additionally, the chest wound was located higher than the back wound, a fact indisputably consistent with the police officers' account of Officer Lake's position in relation to Wilson: Officer Lake was on the stairs outside Wilson's apartment aiming downward towards Wilson when he fired the fatal shot.[2]

Appellants next contend that when Wilson's body was exhumed, the chest wound had been excised and sewn shut. From this, Appellants speculate that Dr. Frost must have removed the tissue surrounding the wound in anticipation that Appellants might one day exhume the body to conduct an independent examination. We find this fact wholly insufficient to raise a reasonable inference of a conspiracy. Appellants did not produce any evidence that Dr. Frost was responsible for this excision. Nor did Appellants produce any evidence, other than the excision itself, that it was done for some nefarious purpose. Finally, Appellants argue that the police officers' account of the shooting is implausible because under that account, Wilson's left hand was on the trigger, while the undisputed evidence is that Wilson was right-handed. Again, we do not believe it reasonable to permit an inference from this fact that Appellees have conspired to cover up Officer Lake's use of excessive force. In fact, because the undisputed evidence also established Wilson was holding several shotgun shells

_____

[2] Because of the undisputed evidence of the bullet's trajectory, as confirmed by its resting place in the lower part of the back wall of the room, we accept counsel for Appellees' representation at oral argument that the only way the physical evidence could be consistent with Officer Lake shooting Wilson in the back was if Wilson was hanging upside down from the ceiling with his back to Officer Lake.

10

in his right hand, the reasonable inference is that Wilson had his left hand on the trigger to expedite any necessary reloading of the gun with his free right hand.**3**

While we recognize that direct evidence of a conspiracy is not always available, we cannot use this fact as an excuse to forgive Appellants' failure to prove their case. There is a reason why we do not allow this level of conjecture to determine lawsuits: such adventures of the mind tend to be unreliable. Appellants' conspiracy claim was ripe for an adverse summary judgment determination; it was based upon a theory without proof. Appellants' circumstantial evidence was probative of a conspiracy only through speculation and the piling of inferences; hence, the district court properly dismissed this claim.**4** See Beale v. Hardy , 769 F.2d at 214.

C. Due process

After concluding Wilson's autopsy, Dr. Frost ordered the incineration of Wilson's internal organs. This order was consistent with an informal policy of State Medical Examiner Sopher. Appellants contend that the district court erred in granting summary judgment to Drs.

_____

**3** Appellants also contend as further evidence of a conspiracy, that a burglary was reported at Wilson's apartment on the day after the shooting. The police incident report makes reference to two white males in blue jackets entering through the side of the apartment. Appellants speculate that these might have been police officers entering the apartment to destroy or alter evidence tending to establish the trajectory of the bullet fired from Officer Lake's gun. Appellants' mere speculation about this incident, however, is not competent evidence of a conspiracy.

**4** Our holding that Appellants failed to establish a § 1983 conspiracy to deny them court access also disposes of their separate claim of conspiracy under §§ 1985 & 1986. Appellants contended Appellees conspired to obstruct the due course of justice with intent to deny to Appellants the equal protection of the laws. See 42 U.S.C.§ 1985(2). The same evidence Appellants proffered to support their claim of conspiracy to deny them court access also served as the basis for their claim that Appellees conspired to obstruct justice. And, our holding renders moot Appellants' contention that the district court erred in interpreting Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir. 1984), as precluding Wilson's siblings from recovery against Appellees for conspiracy to obstruct justice.

11

Frost and Sopher on their claim that their disposal of Wilson's internal organs after the autopsy without first notifying Wilson's family members and providing them an opportunity to be heard violated the Due Process Clause. We reject this claim, finding that to the extent it is cognizable under § 1983,[5] Drs. Frost and Sopher were entitled to qualified immunity.

The Due Process Clause of the Fourteenth Amendment protects against deprivations of property without constitutionally adequate procedures. The Constitution does not enumerate these property rights, but allows state law to define and establish them. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985). If, however, the property right asserted is not clearly established such that a reasonable person would have known of the right, the doctrine of qualified immunity shields public officials from liability. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citing Procunier v. Navarette, 434 U.S. 555, 565 (1978)).

_____

[5] As noted by the district court, deprivations of rights protected by the Due Process Clause are not recoverable under § 1983 if the state provides a post-deprivation tort remedy and the state actor was not acting pursuant to a procedure established by state law. Hudson v. Palmer, 468 U.S. 517, 533 (1984); cf. Brotherton v. Cleveland, 923 F.2d 477, 482 (6th Cir. 1991) (holding that relatives' claim for disposal of decedent's corneas without due process was cognizable under§ 1983 where defendants acted pursuant to a procedure established by state statute). Dr. Frost was not acting pursuant to established state law when he disposed of Wilson's organs; rather, he acted pursuant to a local informal policy. Hence, as long as West Virginia provides an adequate post-deprivation remedy, no § 1983 action will lie.

Under West Virginia law, Appellants can file a claim for the mishandling of Wilson's body. See Whitehair v. Highland Memory Gardens, Inc., 327 S.E.2d 438, 441 (W.Va. 1985). This post-deprivation remedy is likely sufficient to adequately protect Appellants' property rights such that their § 1983 claim must fail. See Arnaud v. Odom, 870 F.2d 304, 309 (5th Cir.) (holding that due process claim against doctor for performing unauthorized experiments on decedent during autopsy was not cognizable under § 1983 where state law provided a cause of action for tampering with a corpse), cert. denied, 493 U.S. 855 (1989). However, we do not dispose of Appellants' due process claim on this ground.

12

Appellants cite Whitehair v. Highland Memory Gardens, Inc., 327 S.E.2d 438 (W.Va. 1985), for the proposition that they have a state-created property right in Wilson's organs. In Whitehair, the West Virginia Supreme Court recognized that family members have a quasi-property right to the body of their decedent "to receive it in the condition in which it was left, without mutilation; to have the body treated with decent respect, without outrage or indignity thereto; and to bury or otherwise dispose of the body without interference." Id. at 441. The court did not, however, define the exact parameters of this property right. That case itself, like the cases cited in support of its holding, involved the mishandling of bodies in relation to the interment process. No cases from West Virginia have held that this property right prevents a medical examiner from disposing of a decedent's organs after performing an autopsy.

In light of the lack of any West Virginia law extending this right to circumstances similar to those presented here, we hold that Drs. Sopher and Frost are entitled to qualified immunity. See Simmons v. Poe, 47 F.3d 1370, 1385 (4th Cir. 1995) (holding that to determine whether a right is clearly established, a court should not focus on the right at its most general level, but rather at the level of its application to the specific conduct being challenged) (citation omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner , 973 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993). A reasonable person would not have concluded that the doctors' conduct violated the law; hence, Appellants' claim was properly dismissed at summary judgment.

III.

Next we examine Appellants' claims that various trial errors prejudiced their ability to establish their case of excessive force against Officer Lake. Specifically, Appellants contend the district court erroneously admitted a computer-animated videotaped demonstration of the Appellees' theory of the case; and that the court erroneously excluded testimony that Officer Walker disposed of Wilson's sweatshirt, testimony that Wilson's chest wound was excised, and microscopic slides of tissue taken from Wilson's body during the second autopsy.

13

We review a district court's decisions whether to admit or exclude evidence for abuse of discretion. Hottle v. Beech Aircraft Corp., 47 F.3d 106, 111 (4th Cir. 1995).

A. Videotaped simulation

At trial, Alexander Jason, a Forensic Animation Technologist, testified for the Appellees to a version of the shooting that was based on his interpretation of the evidence and was consistent with the police officers' testimony. To illustrate Jason's testimony, Appellees introduced a computer-animated videotape. The videotape depicted Wilson's apartment complex, the officers' position in relation to the open door to Wilson's apartment, and a step-by-step account of the incident. It showed an animated version of Officer Lake on the stairwell outside the apartment aiming his gun toward Wilson, who was moving toward the open door. It depicted Wilson raising his shotgun toward the doorway, Officer Lake firing the fatal shot, Wilson's body spinning around from the force of the shot, and his shotgun discharging into the stuffed chair in the back of the room. It then showed how the officers' version of the event was consistent with the physical evidence by concluding with a depiction of the trajectory of Officer Lake's bullet in-line with the wounds to Wilson's forearm, chest, back, and the bullet hole in the wall of the room.

Appellants assign as error the district court's denial of their motion in limine to suppress this evidence. Appellants contend the videotape was inadmissible because it was experimental evidence that attempted to recreate the events but failed to reflect conditions substantially similar to those existing at the time of the shooting.

Typically, demonstrations of experiments used to illustrate principles forming an expert's opinion are not required to reflect conditions substantially similar to those at issue in the trial. Gladhill v. General Motors Corp., 743 F.2d 1049, 1051 (4th Cir. 1984). We have, however, recognized the unique problems presented by the introduction of videotapes purporting to recreate events at the focus of a trial. In Gladhill, we noted the potential prejudicial effect of such evidence because the jury viewing a recreation might be so persuaded by its life-like nature that it becomes unable to visualize an opposing viewpoint of those events. Hence, we established a requirement that video-

14

taped evidence purporting to recreate events at issue must be substantially similar to the actual events to be admissible.

Obviously, the requirement of similarity is moderated by the simple fact that the "actual events" are often the issue disputed by the parties. Nonetheless, to the extent the conditions are not a genuine trial issue, they should be reflected in any videotaped recreation. In Gladhill, for instance, the plaintiff crashed his car into a utility pole. He sued General Motors in a products liability action, contending that the brakes were faulty. The parties agreed that at the time of the accident it was night, and plaintiff was driving down a hill at a sharp curve in the road when he struck the utility pole. General Motors introduced a videotaped recreation of the accident that was conducted at a test facility on a flat, straight, asphalt surface in daylight by an experienced driver. We rejected the use of this videotape, holding that "when the demonstration is a physical representation of how an automobile behaves under given conditions, those conditions must be sufficiently close to those involved in the accident at issue to make the probative value of the demonstration outweigh its prejudicial effect." Id. at 1052; see also Chase v. General Motors Corp., 856 F.2d 17, 19-20 (4th Cir. 1988).

We have not previously applied the requirement of "substantial similarity" to computer-animated videotapes that purport to recreate events at issue in trial. We fail to see a practical distinction, however, between a real-life recreation and one generated through computer animation; both can be a particularly powerful recreation of the events. Nonetheless, we need not explicitly decide this issue because we are satisfied the jury here fully understood this animation was designed merely to illustrate Appellees' version of the shooting and to demonstrate how that version was consistent with the physical evidence. The district court carefully instructed the jury on this point:

> [t]his animation is not meant to be a recreation of the events, but rather it consists of a computer picture to help you understand Mr. Jason's opinion which he will, I understand, be giving later in the trial. And to reenforce the point, the video is not meant to be an exact recreation of what happened during the shooting, but rather it represents Mr. Jason's evaluation of the evidence presented.

15

Although there is a fine line between a recreation and an illustration, the practical distinction "is the difference between a jury believing that they are seeing a repeat of the actual event and a jury understanding that they are seeing an illustration of someone else's opinion of what happened." Datskow v. Teledyne Continental Motors Aircraft Prods., 826 F. Supp. 677, 686 (W.D.N.Y. 1993). The jury understood that the very thing disputed in this trial was the condition under which the shooting occurred. In light of this fact and the court's cautionary instruction, there was no reason for the jury "to credit the illustration any more than they credit the underlying opinion." Id.

We are convinced Appellants suffered no undue prejudice as a result of this computer animation, and we will not disturb the broad discretion afforded trial judges in this area. In reaching this holding, however, we are not unmindful of the dramatic power of this type of evidence; hence, we encourage trial judges to first examine proposed videotaped simulation evidence outside the presence of the jury to assess its foundation, relevance, and potential for undue prejudice.

B. Wilson's sweatshirt and chest wound

At trial, Appellants sought to introduce evidence that Officer Walker inexplicably disposed of Wilson's sweatshirt within days of the shooting. Appellants also sought to introduce evidence that when they exhumed Wilson's body to perform a second autopsy, the chest wound appeared to have been completely excised. The district court granted Appellees' motions in limine to exclude this evidence, holding that it was no longer relevant in light of the dismissal of Appellants' conspiracy claims and that its admission would likely result in unfair prejudice.

Appellants contend the district court abused its discretion in this regard because the evidence was relevant to their claims of wrongful death and excessive force. According to Appellants, the fact the sweatshirt was disposed of was probative on whether Wilson was shot in the back because the fibers around the bullet holes served as a partial basis for Dr. Frost's opinion that Wilson was shot in the chest. Hence, Officer Walker's destruction of this evidence raises an inference that the sweatshirt did not actually support Dr. Frost's conclusion. Similarly, Appellants contend Wilson's excised chest wound

was relevant to the excessive force and wrongful death claims because it impaired Appellants' ability to conduct an adequate independent second autopsy on the body. Appellants infer that Appellees excised the chest wound before interment so that Appellants would be unable to disprove the finding that Wilson was shot in the chest.

We find no abuse of discretion with respect to either of these evidentiary rulings. In fact, both items of evidence were properly excluded for the same reason Appellants' civil conspiracy claim was properly dismissed--the fact Appellants would like to have proved through admission of the evidence could be reached only through speculation and the piling of inferences. Appellants offer no evidence that Officer Walker was attempting to hide evidence when he disposed of the sweatshirt, that he had any idea the shooting was an issue, or that he was aware Dr. Frost had partially relied on the sweatshirt in reaching the conclusion that Wilson was shot in the chest. Similarly, evidence that the chest wound was excised was probative only of whether Wilson was shot in the back through pure speculation. Appellants offered no evidence that Dr. Frost was responsible for this act, or that it was done to hide evidence. We accordingly find no error in the district court's exclusion of this speculative evidence.

C. Tissue slides

Appellants contend the district court abused its discretion in disallowing introduction of tissue slides prepared by Dr. Wecht in conjunction with the second autopsy. We disagree. The district court had previously ordered discovery to be completed by July 31, 1993. By this date, Appellants were obligated to turn over any tissue samples taken by Dr. Wecht during the second autopsy. During his deposition on June 22, 1992, Dr. Wecht testified that he had taken tissue samples from Wilson's body, but that they were accidently thrown away during a cleaning of the laboratory. Doctor Wecht testified further that it was his opinion Wilson was shot in the back. Doctor Wecht did not state that the tissue samples formed the basis for his opinion. After the deposition, but prior to the discovery deadline, Appellees were advised that Dr. Wecht had located the slides containing the tissue samples. Appellees conducted a second deposition of Dr. Wecht. This time Dr. Wecht testified that the slides were an important basis for his

17

opinion that Wilson was shot in the back. It took Appellants nearly three more weeks, which was approximately one month prior to trial, to turn the slides over to Appellees.

The district court suppressed this evidence because it was "late-discovered" and not turned over until after the discovery deadline. Appellees contend this ruling was proper because they were not given enough time to conduct their own testing on the tissue samples. Appellants argue that Appellees had ample time to test the slides, but merely chose not to. District courts enjoy nearly unfettered discretion to control the timing and scope of discovery and impose sanctions for failures to comply with its discovery orders. Mutual Federal Sav. & Loan Ass'n v. Richards & Associates, Inc., 872 F.2d 88, 92 (4th Cir. 1989). We refuse to interfere with this discretion; Appellants had ample opportunity to disclose this evidence to Appellees before the July 31, 1993 deadline.

IV.

We last turn to Appellants' contention that the accidental admission of evidence at trial concerning the missing sweatshirt prejudiced their case such that their motion for a new trial should have been granted. Because Wilson's sweatshirt was thrown away by Officer Walker, the district court disallowed any evidence at trial relating to the sweatshirt. Hence, the Appellees were unable to introduce testimony concerning the direction of the fibers surrounding the front and back bullet holes, and Appellants could not comment on the fact Officer Walker had disposed of this potentially important piece of evidence.

At the close of trial, prior to the jury's deliberation, both sides were given an opportunity to examine the evidence before it was submitted to the jury. Appellants apparently missed a portion of Dr. Frost's autopsy reports in which the doctor referenced the sweatshirt. It should have been redacted in accordance with the district court's previous order. In the report, Dr. Frost described the fibers surrounding the bullet hole in the back of the sweatshirt as everted. After the jury received the evidence, it sent one question to the court asking for a definition of the word "everted." The district court subsequently prepared a curative instruction to the effect that the jury was not to con-

18

sider any evidence relating to the sweatshirt. Neither party objected to this solution, and the instruction was presented to the jury. Appellants thereafter raised this issue as part of their motion for a new trial.

Appellants contend they were entitled to a new trial because of the prejudice caused by the jury's improper consideration of the unredacted portion of Dr. Frost's report. Appellees respond that Appellants waived any complaint about submission of the sweatshirt because they equally shared the responsibility to see that unadmitted exhibits were not sent to the jury deliberation room. See United States v. Strassman, 241 F.2d 784, 786 (2d Cir. 1957). Even assuming this issue was properly preserved for review,[6] we reject it as meritless.

Where a jury is exposed to unadmitted evidence, a presumption of prejudice arises. United States v. Brooks, 957 F.2d 1138, 1142 (4th Cir.), cert. denied, 505 U.S. 1228 (1992); United States v. Greene, 834 F.2d 86, 88 (4th Cir. 1987); United States v. Barnes, 747 F.2d 246, 250 (4th Cir. 1984). The burden falls upon the government to demonstrate the absence of prejudice. Brooks, 957 F.2d at 1142. The district court's decision to deny a motion for a new trial on this basis is reviewed for abuse of discretion. Greene, 834 F.2d at 88.

We find no abuse of discretion here because it is evident the district court took reasonable steps to alleviate any potential prejudice to Appellants. The court took suggestions from both parties concerning the proper course to mitigate the impact of admission of this evidence, and ultimately gave a curative instruction that was agreed to by attorneys for both parties. The instruction specifically told the jury it was not to consider any evidence relating to the sweatshirt. Juries are presumed to follow instructions provided them, United States v. Thorton, 1 F.3d 149, 156 (3d Cir.), cert. denied, 114 S. Ct. 483 (1993), and the

_____

[6] Apart from the fact Appellants were given an opportunity to inspect the exhibits before they were submitted to the jury, Appellants likely forfeited review of this issue by failing to seek a mistrial during deliberations when the mistake was discovered. Cf. United States v. Greene, 834 F.2d 86, 88 (4th Cir. 1987) (motion for a new trial appropriate mode to preserve issue where mistake of sending unadmitted evidence to jury deliberation room was not discovered until after jury returned its verdict).

19

mere fact the jury found for Appellees is not evidence that it ignored this curative instruction. We, therefore, reject Appellants' claim.

V.

Accordingly, the order of the district court granting summary judgment in part, and the entering of judgment for the Appellees after a jury trial on Appellants' remaining claims is

AFFIRMED.

20