**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GARY SIGMAN, individually and as
administrator of the estate of Mark
Anthony Sigman; BRIGIT ELLEN
SIGMAN,
<u>Plaintiffs-Appellants,</u>

v.                                                                                          No. 97-1652

TOWN OF CHAPEL HILL; CHAPEL HILL
POLICE DEPARTMENT; RALPH V.
PENDERGRAPH, Police Chief;
STEPHEN K. RIDDLE,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-95-364-1)

Argued: May 6, 1998

Decided: December 2, 1998

Before NIEMEYER and MICHAEL, Circuit Judges, and
FRIEDMAN, United States District Judge for the Eastern District
of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Friedman joined. Judge Michael wrote a dissenting
opinion.

_____

**COUNSEL**

**ARGUED:** Timothy Stig Nugent, NUGENT, WILSON & ASSO-CIATES, Winston-Salem, North Carolina, for Appellants. Dan McCord Hartzog, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Kari L. Russworm, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellees.

_____

**OPINION**

NIEMEYER, Circuit Judge:

After Mark Sigman was fatally shot during a standoff with Chapel Hill, North Carolina police officers, Sigman's parents brought suit under 42 U.S.C. § 1983 against the police officers and the town of Chapel Hill, alleging excessive force in violation of the Fourth, Eighth, and Fourteenth Amendments, and under N.C. Gen. Stat. § 28A-18-2, alleging wrongful death. The district court granted the defendants' motion for summary judgment on both claims, holding that the police officer who shot Sigman acted reasonably in the circumstances confronting him. We affirm.

I

About 9:30 p.m. on May 22, 1993, Donna Solomon yelled to her neighbors to call 911 to request help in connection with a domestic dispute between her and her live-in boyfriend, Mark Sigman. When Chapel Hill police officers Anthony Brooks and Jack Terry arrived at the duplex where Solomon and Sigman lived, Solomon met them on the front lawn and told them that Sigman was inside the house and out of control and that she wanted the police to help calm him down. She also told the officers that Sigman had recently been laid off from his job and had drunk five or six beers. Although she initially told the officers that she did not think Sigman had access to any weapons, she later told Officer Terry that Sigman had a knife.

When the two officers approached the duplex and knocked on the front door, Sigman told them to "get the hell away from the door."

2

Because Officer Terry was familiar with Sigman, he attempted to engage Sigman in conversation. But as he did, the officers heard beating and banging at the door, and Sigman began screaming, "You had better get on down the road," "Go get on down the road, or I'm going to cut your head off," and "I'm going to kill her." He also broke a glass window beside them. The officers drew their guns and retreated. The two officers then called for the assistance of the on-duty supervisor, Officer Stephen Riddle.

When Officer Riddle arrived on the scene, Officer Terry informed him of the situation, telling him that Sigman was inside the house enraged, was throwing things, and was armed with a knife. Donna Solomon informed Officer Riddle that Sigman had been drinking, that he had cut himself, and that he was destroying things inside the house. At this point, Officers Peter Wan, John McKerlie, and Rebecca Snyder arrived on the scene. As the commanding officer on the scene, Officer Riddle instructed the other officers to form a perimeter around the house.

Officer Riddle then attempted to talk to and calm Sigman, whom Riddle perceived to be "highly volatile." In response, Sigman called him a "mother f--ker," and said, "I'm going to kill you." He threw objects at Officer Riddle through the broken window and reached through the window with his knife "to emphasize his point." Officer Riddle then approached the window, broke the rest of the glass with his baton, and attempted to pepper spray Sigman. But Sigman began swinging a knife at Riddle through the window, and Riddle retreated. Riddle then trained his police car lights on the house and called a special emergency response team for back up. Sometime during this interaction, Officer Riddle asked Sigman to come out, but Sigman replied with words similar to, "If you want me, come in and get me. But you're going to get hurt."

Before the emergency response team could arrive, Sigman stepped out of the house, and, according to all of the police officers, he held a knife in his right hand. He was disheveled and bloody, and the knife he carried was a chef's knife with the tip broken off. Officers Riddle, Brooks, and Terry yelled for Sigman to drop the knife and stop approaching. Although they gave these warnings several times, Sigman ignored them, making statements such as, "Go ahead and shoot

3

me" and "I want to die." By this time, a crowd had gathered along the street behind the officers some distance away and was cheering Sigman on. Sigman continued to walk toward Officer Riddle, holding his knife in a threatening manner. By this time, Officers Terry, Brooks, Riddle, and Snyder had drawn their guns. As Sigman continued to approach and was 10 to 15 feet away from Officer Riddle, Riddle shot Sigman twice in rapid succession, mortally wounding him. Officer Riddle states that, at the time of the shooting, he believed that Sigman presented a danger to his life and safety and to the life and safety of others.

Officers Riddle and McKerlie approached Sigman, who was now lying on the ground on his back. On the ground near Sigman's hand was the chef's knife with a broken tip, which Officer McKerlie kicked away from Sigman's reach. The officers found that Sigman had been hit by one bullet in his abdomen and was now unconscious and having trouble breathing. They administered first aid to Sigman until an emergency medical team arrived. Sigman died in the hospital six hours later.

According to the officers, the Chapel Hill police department trains them in dealing with persons armed with knives. As Officer Snyder stated, "We are trained -- twenty-one feet is the closest you let someone get with an edged weapon because they can cut you or kill you before you can even fire." This policy is confirmed by a police expert, who stated that the 21-feet standard "is based on studies which have shown that an armed individual within twenty-one feet of an officer still has time to get to the officer and stab and fatally wound the officer even if the officer has his weapon brandished and is prepared to or has fired a shot."

Two years after Sigman's death, Sigman's parents filed this action, in two counts, on behalf of themselves and as administrators of Sigman's estate, naming as defendants Officer Riddle, the town of Chapel Hill, its police department, and its police chief. The first count, brought under 42 U.S.C. § 1983, alleged violations of Sigman's Fourth, Eighth, and Fourteenth Amendment rights based on the claim that Officer Riddle acted unreasonably when he shot Sigman while he was about 15 feet away. It also alleged that the police chief and police department trained Officer Riddle in a way that deprived

4

Sigman of his constitutional rights. The second count, brought under North Carolina General Statute § 28A-18-2, alleged wrongful death based on the claim that the defendants breached their duty to exercise due care in dealing with Sigman. The plaintiffs demanded both compensatory and punitive damages.

The defendants filed a motion for summary judgment, contending that the officers are protected from liability in their individual capacity by qualified immunity, that the officers did not use unreasonable force, and that unreasonable force was not a custom or practice of the police department. Among the materials submitted, the defendants included affidavits of two police experts who, after reviewing the record, asserted that Officer Riddle did exactly what a reasonable police officer would have done in similar circumstances and what police officers are trained to do in those circumstances.

In response to the defendants' motion for summary judgment and over three-and-a-half years after Sigman's death, the plaintiffs' lawyer located three witnesses, Kecia Roberson, Tejuana Roberson, and Charlotte Davis, who were among the cheering crowd across the street from Sigman's duplex on May 22, 1993. Each of these witnesses signed an affidavit in identical form, on the same date, and with the same error that they observed the incident on May 23, a day after the incident. In their affidavits they stated that pursuant to the police officers' numerous commands, "Sigman came out of the house, with his hands raised"; that they "could clearly see Mark Sigman's hands and that he had nothing in them"; that Sigman was intoxicated; that the officers shot Sigman three steps from the front door; and that based on their observations, "Mark Sigman represented no threat of any kind to officer and that the officer shot him for no reason."

In granting the defendants' motion for summary judgment, the district court stated that the affidavits of Roberson, Roberson, and Davis were not sufficient to create a material issue of fact. The court observed that, "at best," the affidavits created "a difference of opinion as to what the three witnesses observed . . . and what Riddle observed and did in reaction to the conduct of Sigman." The court held that nothing contradicted the fact that a reasonable officer would have perceived Sigman as a dangerous threat. It therefore concluded that Sigman's constitutional rights were not violated. The court also held that,

5

because Officer Riddle's actions were objectively reasonable as a matter of law, the plaintiffs' state law claims also failed.

This appeal followed.

II

Sigman's parents contend that the affidavits of the three witnesses, Roberson, Roberson, and Davis, create a genuine issue of material fact and therefore that the district court erred in granting the defendants' motion for summary judgment. They argue that the affidavits create factual disputes as to whether Sigman had a knife when he was shot, as to whether Officer Riddle's perception that Sigman had a knife was reasonable, and as to whether Sigman was a threat to the officers when he was shot. They also contend that the town of Chapel Hill, the police department, and the police chief should be subject to liability because they improperly trained their officers to shoot when an armed person comes within 21 feet of them.

We address first the question of whether Sigman's parents created a factual dispute with respect to the issue of qualified immunity.

Police officers are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because qualified immunity is an immunity from suit, and not merely a defense to liability, courts must scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Indeed, when a district court declines to give a qualified immunity defense a hard look at an early stage in the litigation, either pursuant to a Rule 12(b)(6) motion to dismiss or a summary judgment motion, it risks the forfeiture of some of the protections afforded by the defense because the immunity includes "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question." Behrens v. Pelletier, 516 U.S. 299, 306 (1996) (quoting Mitchell, 472 U.S. at 526); see also Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir. 1996) ("One of the purposes of immunity . . . is to spare a defendant

6

not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit" (quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991))).

In the case where a plaintiff alleges that a police officer has unconstitutionally used deadly force, the officer's actions are judged on a standard of objective reasonableness. See Graham v. Connor, 490 U.S. 386, 396-97 (1989). And in determining objective reasonableness, the court must consider what a "reasonable officer on the scene" would have done, taking into account such factors as"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair. Thus,

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

Id. at 396-97.

On the record before us, it is undisputed that, at the moment that Sigman stepped out of the house, Officer Riddle had ample knowledge of Sigman's dangerousness. Riddle knew that Sigman had a knife and was enraged inside the house, cutting himself. He knew that Sigman had been drinking and throwing things. He knew that Sigman was willing to use his knife on others because Sigman had slashed at him through the window. He knew that Sigman had made threats on his life, on his fellow officers' lives, and on Donna Solomon's life. And he knew that Sigman had not previously responded to his requests to calm down or come out of the house. Furthermore, when Sigman emerged from the house, he did not obey the officers' commands. Rather, he took a number of steps towards Officer Riddle. Riddle, and all of the officers at the scene, perceived that Sigman was

7

holding a knife as he moved forward towards Officer Riddle, and the crowd behind Riddle was "taunting [Sigman] to continue." It is undisputed that the atmosphere was volatile and threatening. These circumstances are exactly the kind that a qualified immunity analysis requires us to consider. See Graham, 490 U.S. at 396-97; Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) ("The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection"). Faced with this tense and dangerous situation, we conclude that Officer Riddle reasonably perceived a threat to his safety and the safety of others and that his response therefore was objectively justified and reasonable.

The plaintiffs argue that the affidavits of the Robersons and of Davis create a material issue of fact as to whether Officer Riddle reasonably perceived that Sigman had a knife. But "[i]t will nearly always be the case that witnesses . . . differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced." Gooden v. Howard County, 954 F.2d 960, 965 (4th Cir. 1992) (en banc) (emphasis added). The three witnesses in this case were located across the street amidst a crowd cheering Sigman on, as if the confrontation were a game or contest.* Their observations cannot effectively impact the credibility

_____

*The record shows that the incident occurred in front of the house after Sigman came out of the front door. The officers secured the streets, blocking traffic and moving the crowd across the street, which was observing from a rise across the street, probably more than 50 feet away. The house was over 30 feet from the curb. J.A. 346T. Because the sides of the house and the streets around it were secured, any observer would have been from among the crowd across the street. J.A. 163, 169, 195, 237, 269, 295. Indeed, all three of the witnesses claimed to observe from across the street, stating, "I was living in Pritchard Park across from Mark Sigman when I witnessed police arrive," etc. It was this crowd that cheered Sigman on. As Officer Snyder testified:

> Q. Did it appear to you that the crowd of onlookers was somehow encouraging him in advancing when he was doing that -- towards Riddle?

8

of Officer Riddle's testimony (or that of all five other officers on the scene) as to his perceptions of what he saw from an entirely different -- and closer -- vantage point, especially when Officer Riddle had special knowledge of Sigman's dangerousness and of the threats that Sigman had made on his life.

Furthermore, even if the affidavits can be considered for what Officer Riddle perceived and thereby cast doubt on whether Riddle saw something that was not there, a police officer need not, in all circumstances, "actually detect the presence of an object in a suspect's hands before firing on him." McLenagan v. Karnes , 27 F.3d 1002, 1007 (4th Cir. 1994). The affidavits do not dispute the fact that a large knife was recovered from the ground near Sigman after he was felled by shots. Notwithstanding the possibility of a dispute about whether a knife was actually in Sigman's hand at the moment of the shooting, Officer Riddle, and the other officers present, acted on the perception that Sigman had a knife in his hand. Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently -- and potentially still is -- armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable. Accordingly, we reject the argument that a factual dispute about whether Sigman still had his knife at the moment of shooting is material to the question of whether Officer Riddle is entitled to the protections of qualified immunity in the particular circumstances of this case.

Because we conclude that Officer Riddle's actions were reasonable, we need not address in any great length the plaintiffs' federal claims against the police department, the chief of police, and the town of Chapel Hill because "[i]n the absence of any underlying use of

_____

> A. Yes, sir. Yes, sir. They were screaming and yelling. They had all crowded up on top of the hill at Pritchard Park and were screaming and yelling, you know. I remember feeling that they were taunting him to continue instead of to give up.

J.A. 305.

9

excessive force . . ., liability cannot be placed on either the non-shooting officers, a supervisor, or the City." <u>Hinkle v. City of Clarksburg</u>, 81 F.3d 416, 420 (4th Cir. 1996). We do note, however, that municipal liability can only ensue when an injury is caused by the execution of a municipal policy or custom when that policy or custom is a result of "policymaker fault of at least the degree of deliberate indifference to or reckless disregard for the constitutional rights of persons within police force jurisdiction." <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1390 (4th Cir. 1987). The only municipal policy that the plaintiffs have identified is the department's training rule that an officer may use deadly force to stop a threatening individual armed with an edged weapon when that individual comes within 21 feet. As the basis for this rule, the department identified studies which have shown that an assailant with an edged weapon within 21 feet of an armed police officer can kill the officer before the officer can get off a disabling shot.

Sigman's parents argue that this policy amounts to "deliberate indifference" and that it makes a constitutional violation "almost bound to happen." <u>See Spell</u>, 824 F.2d at 1390. There are two reasons why these arguments fail, however. First, the plaintiffs have not produced a shred of evidence that the policy is unreasonable. They have not called an expert, adduced any testimony, or in any way contested or brought into dispute the department's reasons for the policy. Without such evidence, no factual dispute is created. And second, the plaintiffs' whole case rests on the proposition that Sigman was <u>not</u> armed with an edged weapon. If he was not so armed, then this policy had no relevance to Sigman's death.

Because we conclude that Officer Riddle's actions were reasonable, it follows that the other defendants cannot be liable under the federal causes of action. Therefore we need not reach the defendants' other asserted federal defenses.

III

The plaintiffs contend finally that the defendants should be subject to a state law wrongful death action. They argue that the defendants waived their immunity under North Carolina law by taking out insurance and that Officer Riddle's actions were at least negligent, creating

10

liability for both the officer and the town of Chapel Hill. However, because we have concluded that Officer Riddle's actions were, as a matter of law, reasonable in the circumstances of this case, they cannot be negligent or wrongful, as required by N.C. Gen. Stat. § 28A-18-2(a).

Because the plaintiffs have no state law claim, we need not reach the issue of whether state governmental immunity was waived.

AFFIRMED

MICHAEL, Circuit Judge, dissenting:

This case comes to us on appeal from the grant of summary judgment for the Town of Chapel Hill, Officer Stephen Riddle, and all other defendants. Consequently, our task is a narrow one. We must decide whether the evidence offered by the plaintiffs, the parents of Mark Sigman, is legally sufficient to reach a jury. We must accept the plaintiffs' evidence as true and make all justifiable inferences in their favor. With this narrow task in mind, this case boils down to a single question: would a reasonable police officer have perceived a threat of serious harm to himself or others that justified firing on Sigman after he walked out of his house. The majority apparently believes that Officer Riddle was justified as a matter of law in using deadly force on the facts of this case. Tempting as it is to grant summary judgment to the police, there is enough here for a jury to evaluate the credibility of three eyewitnesses who say that Sigman had his hands up and they were empty when Officer Riddle shot him. In other words, on the present record there is a sufficient factual dispute about the threat posed by Sigman to create a genuine issue for trial. [1] I respectfully dissent.

_____

[1] On remand I would give the defendants the opportunity (before trial) to expand the record in an effort to support a renewed motion for summary judgment. See part III, infra.

11

I.

A.

Our review of an award of summary judgment is de novo. See Motor Club of America Ins. Co. v. Hanifi, 145 F.3d 170, 174 (4th Cir. 1998). If the papers filed in district court show a "genuine issue as to any material fact," summary judgment is inappropriate. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-51 (1986). In other words, when the parties dispute a material fact and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment must be denied. See Anderson, supra at 248; see also Motor Club, 145 F.3d at 174. In determining whether a reasonable jury could find for the nonmoving party, a court must "view[ ] the facts and the inferences drawn there-from in the light most favorable to the nonmoving party." See Motor Club, 145 F.3d at 174; Porter v. United States Alumoweld Co., 125 F.3d 243, 245 (4th Cir. 1997). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Accordingly, the nonmoving party's "version of any dis-puted issue of fact . . . is presumed correct." See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). With these controlling principles in mind, I now turn to the facts in this case.

B.

On May 22, 1993, Mark Sigman had lost his job, was drunk and belligerent, and had threatened to harm himself, his girlfriend, and the police. As the majority recounts, Sigman had locked himself in his house, had repeatedly cut himself with a knife, had slashed at Officer Riddle with a knife as Riddle tried to pepper spray him through a win-dow, and had refused police instructions to come outside. But the majority's version of the facts is flawed from the point Sigman opened his front door to come out of the house. From that point the record reveals contradictory versions of the facts.

It is true that Officer Riddle testified in deposition that Sigman came out of the house with a chef's knife in his right hand. He also testified that Sigman held the knife "out in front of him" and "below

12

his shoulder." Riddle was standing between the curb of the road and a line of trees when Sigman left the house. Riddle claims that he yelled to Sigman, "Drop the knife" and "don't come forward." Riddle then took a defensive position behind a tree and drew his revolver. According to Riddle, Sigman did not halt but kept walking forward. Then, Riddle claims that he fired at Sigman when Sigman, armed with the knife, was ten to fifteen feet away from him.

The other police officers on the scene also testified that Sigman was armed with a knife, but their stories are somewhat inconsistent.[2] The variation in the officers' description of the knife and the manner in which Sigman held it might affect the credibility of their stories if the evidence was weighed by a jury. But that is beside the point for now. At this stage we must accept as true the three affidavits of Kecia Roberson, Tajuana Roberson, and Charlotte Davis. [3] Each affiant

_____

[2] For example, although Riddle testified that Sigman held the knife below his shoulder, Officer Brooks testified that he held it "up by his head in his right hand" with the blade pointing forward. Officer Terry stated that the knife was held above Sigman's shoulder, Officer McKerlie said it was held about shoulder height, and Officer Snyder recalled that Sigman held the knife above his head and was waving it around in an aggressive manner. Similarly, their description of the knife varies a great deal. Officer Terry stated that the knife was nine inches or more in length with a "very wide blade," adding that it was "not something that you would mistake." Nevertheless, McKerlie believed the knife was only six or seven inches long, and Snyder testified that it was "a long thin knife -- not very wide" and was approximately twelve to fourteen inches long. After Sigman was shot, a knife was found on the scene by a police investigator who estimated that it was six inches in length.

[3] While the majority suggests that the three lay witnesses were a part of the crowd that was "cheering Sigman on, as if the confrontation were a game or contest," ante at 8, there is no evidence that these witnesses encouraged Sigman to be defiant. The record reveals simply that Roberson, Roberson, and Davis witnessed the shooting.

It appears that these witnesses were on the other side of the residential street bordering Sigman's residence at the time of the shooting, although the record does not specify their exact location. While the majority implies that these witnesses were too far away to observe the shooting accurately, see ante at 4, 8-9, the affidavits contradict this. Each affidavit states that the witness "could clearly see Mark Sigman's hands." The evidence we have now would allow a reasonable jury to conclude that bystanders across the street were in a position to see the shooting.

states that "Sigman came out of the house, with his hands raised. I could clearly see Mark Sigman's hands and that he had nothing in them." For purposes of the summary judgment motion, we must accept this as true. See Eastman Kodak, 504 U.S. at 456; Anderson, 477 U.S. at 249.

We also must accept as true the three witnesses' statements that Mark Sigman was "clearly intoxicated and staggering" when he exited the house and that he "was not more than three steps from the front door when the officer shot him." This account is consistent with Officer Terry's testimony that Sigman took two to four steps and stopped before he was shot. The deposition testimony of Officers Terry, McKerlie, and Snyder add that Sigman was walking "fairly slowly," "slow-[ly]," or "very slow[ly]," before he was shot.

For the purposes of summary judgment, the facts can therefore be summarized as follows. After a contentious and tense standoff with the police, in which Sigman threatened the police and was repeatedly instructed to come out of the house, Sigman stepped through the front door. His empty hands were clearly visible and raised in the air. Although the officers yelled at Sigman to halt, Sigman walked forward slowly, taking approximately three steps before he paused. As he began to move again, Officer Riddle shot him twice, fatally wounding him. It is under this set of facts that we must evaluate the case.

II.

The basic issue of qualified immunity is simple. Law enforcement officers are entitled to immunity from suit whenever their use of deadly force is objectively reasonable. See Graham v. Connor, 490 U.S. 386, 394-97 (1989) (Fourth Amendment not violated by objectively reasonable use of force); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (qualified immunity exists when "conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known"). Such force is appropriate when an objectively reasonable officer could believe that the suspect poses a threat of serious physical harm to himself or others. See Graham, 490 U.S. at 397; Tennessee v. Garner, 471 U.S. 1, 11 (1985) (deadly force). The reasonableness of this perception, and not whether the perception

14

is ultimately correct, determines whether the officer is entitled to qualified immunity from civil lawsuits. See Gooden v. Howard County, 954 F.2d 960, 965 (4th Cir. 1992) (en banc); see also Graham, 490 U.S. at 396.

The majority today affirms the district court's dismissal on qualified immunity with two alternative rulings. First, it holds that the affidavits of three witnesses who saw Sigman exit his house with empty hands in the air "cannot effectively impact the credibility of Officer Riddle's testimony . . . as to his perceptions." See ante at 8-9 (emphasis added). Alternatively, the majority holds that whether Sigman had a knife in his hand when he came out of the house is"[im]material" to the question of whether Officer Riddle reasonably perceived a threat of serious physical harm to himself or others. See ante at 9. I believe that the majority errs in both holdings.

A.

The majority impermissibly displaces the role of the jury by weighing the credibility of Riddle's deposition testimony against the affidavits of three eyewitnesses. It is hornbook law that at summary judgment "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Indeed, we must accept the three eyewitness affidavits as true, and we must draw all justifiable inferences in favor of the plaintiffs.

Although courts must determine whether an officer's perception of a threat was reasonable, the qualified immunity inquiry "focuses on the objective facts" of the case in order to measure the defendant's actions against those of a reasonable police officer in the same circumstances. See Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994) (emphasis added). Specifically, we must ask if the defendant's "perceptions of the objective facts" were reasonable. See id. For example, an officer under certain circumstances could reasonably (but mistakenly) perceive that a beer bottle was a knife. See Slattery v. Rizzo, 939 F.2d 213, 215 (4th Cir. 1991). Likewise, a reasonable officer might perceive that an armed suspect intended to shoot him even

15

though the suspect claimed that he was handing over his gun in surrender. See Wilson v. Meeks, 52 F.3d 1547, 1550 (10th Cir. 1995).

A very different set of facts is presented here, however. Three eyewitnesses have come forward, swearing that they"could clearly see Mark Sigman's hands and that he had nothing in them." Officer Riddle and his colleagues swear that Sigman had a knife. The officers and the eyewitnesses were all in a position to see. A determination of what was actually happening during the event is therefore necessary to evaluate the reasonableness of Officer Riddle's perceptions and actions. Vathekan v. Prince George's County, 154 F.3d 173, 179-80 (4th Cir. 1998); Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992). This requires a trial to sort through the conflicting versions of events told by the officers and the eyewitnesses. See Taylor v. Farmer, 13 F.3d 117, 120 (4th Cir. 1993). This determination of what happened depends on an assessment of the credibility of the respective witnesses, a matter that is inappropriate for resolution on summary judgment. Rainey, 973 F.2d at 324.

We have vastly different stories about what happened in the moments before Sigman was shot, and it is not our place to evaluate the credibility of the competing versions. Put simply, the plaintiffs have presented affidavits which, if true, undermine the police officers' claim to qualified immunity. The affidavits create a genuine dispute over a material fact.

B.

The majority also errs in its alternative ruling that whether Sigman had a knife in his hand at the moment of shooting is immaterial to the question of whether Riddle reasonably perceived a threat of serious bodily harm to himself or others. Under the facts of this case, the issue is quite material to the reasonableness of Riddle's perception of a threat justifying deadly force.

The majority bases its ruling on a quotation from McLenagan v. Karnes, 27 F.3d 1002 (4th Cir. 1994), that is out of context. See ante at 9. A quick review of McLenagan reveals that this quotation has no application to this case. In McLenagan a sheriff's deputy (Smith) was in an office building guarding two seated arrestees who were hand-

16

cuffed with their hands in front of them. See 27 F.3d at 1005. When one of the arrestees jumped up and ran into another room that Smith knew contained a loaded revolver, Smith ran from the room "waving her arms in the air and yelling, `The man has got a gun!'" Id. McLenagan, the other arrestee, ran after Deputy Smith in an effort to escape from danger. Because McLenagan was handcuffed, he ran in a crouched position that concealed his hands. See id. As Deputy Smith ran down a hallway with McLenagan close behind, she passed Officer Karnes and again yelled, "`The man has got a gun!'" See id. Karnes reacted immediately by drawing his gun and shooting McLenagan, even though he could not see if McLenagan had a weapon. In this context this court said, "we do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him." Id. at 1007. While this conclusion was appropriate on McLenagan's facts, it is not appropriate on the facts here.

In this case we must accept that Sigman came out of the house with his hands visible, empty, and raised in the air. Moreover, Sigman did not run out of the house in a threatening manner. The police officers on the scene agree that he walked out of the house slowly or very slowly. Unlike McLenagan where the officer "did not see a gun in McLenagan's hands" and "could not confirm that McLenagan was unarmed," id. at 1007, Officer Riddle was in a position to determine whether Sigman was armed with a knife in his hands. Consequently, the majority's reliance on McLenagan is misplaced.

I cannot accept the majority's conclusion that whether Sigman was actually armed is immaterial to whether Officer Riddle's actions were objectively reasonable. Surely any reasonable police officer would consider this to be a critical factor in assessing the threat in the facts and circumstances of this case. I would hold that the presence or absence of a weapon (or at least something resembling a weapon) is material to the question of whether a reasonable officer would perceive that Sigman posed a serious threat.

III.

On the record before us, I would reverse the district court's award of summary judgment to the defendants. I do note that the three

17

bystanders who say, in short affidavits, that Sigman was unarmed have not been deposed. On remand I would permit the defendants to depose these witnesses. Thereafter (and before any trial), the defendants could renew their motion for summary judgment if they have grounds to assert that a fuller account by the lay witnesses reveals that there is no genuine issue of material fact. On the basis of what we now know, however, I must respectfully dissent.

18