James E. **TAYLOR**, Administrator for the Estate of Brenda K. Taylor, Plaintiff–Appellee,

v.

David **FARMER**; Thomas P. Leonard, Defendants–Appellants.

No. 92–2618.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 27, 1993.

Decided Dec. 27, 1993.

---

Andrew William Wood, Wood & Wood, Richmond, VA, argued, for defendants-appellants.

Joseph Francis Grove, Joseph F. Grove, P.C., Richmond, VA, argued, (Martin R. Johnson, Joseph F. Grove, P.C., on brief), for plaintiff-appellee.

Before PHILLIPS and WILKINSON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

This case gives us an opportunity to explore further the boundaries of the qualified immunity defense to suits alleging Fourth Amendment violations under 42 U.S.C. § 1983. Here, summary judgment on qualified immunity grounds is not available to the officers because a jury could reasonably believe that the officers' personal observations of a detained suspect were utterly inconsistent with descriptions provided them by witnesses, and that the officers' conduct could not be justified by exigent or dangerous circumstances. In so ruling, we affirm the judgment of the district court.

### I.

Detectives David Farmer and Thomas Leonard were partners in the Narcotics Division of the Richmond Bureau of Police. On August 8, 1991, several credit cards belonging to Leonard's wife were stolen from her purse in downtown Richmond. Although formally narcotics detectives at that time, Farmer and Leonard sought and received permission from their supervisor to investigate the case.

In the course of their investigation, Farmer and Leonard visited two locations where the stolen credit cards had been used. One such location was Bootleggers, a retail store in Henrico County. Rosalind Davis, a Bootleggers clerk who had accepted one of the credit cards for a purchase, gave the detectives a description of the card user and agreed to notify them if the suspect returned to the store. Ms. Davis' description of the suspect is not in the record before us. The detectives obtained a second description from Orlando DeJesus, an employee at a 7–Eleven where one of the cards had also been used. Mr. DeJesus described the suspect as a young black woman in her twenties, about 5'7" tall, and weighing approximately 150 pounds. DeJesus added that the suspect wore "a lot of jewelry," was accompanied by a black male, and left the store in a black automobile.

On August 31, 1991, Rosalind Davis contacted Detectives Farmer and Leonard to notify them that the woman she "felt had used the stolen credit card" had returned to Bootleggers. Davis also supplied the detectives with a license plate number for the car the woman drove, a white automobile registered to James Taylor. The officers immediately travelled from South Side Richmond,

where they were conducting an ongoing narcotics investigation, to visit Ms. Davis at the Bootleggers store. From there, they headed to Taylor's home in search of the suspect.

James Taylor, Jr. ("J.T."), the twenty-two year old son of James and Brenda Taylor, answered the door when the detectives arrived at the Taylor home. The officers displayed their badges and, according to J.T.'s deposition testimony, asked him if he had a sister who drove the car in the driveway. J.T. responded that he did not have a sister and that his mother drove the car. In response to the officers' request, J.T. then summoned his mother from her upstairs bedroom, where she was resting on her bed. Mrs. Taylor had undergone dialysis that morning, a procedure she frequently underwent in the treatment of her kidney disease. When Brenda Taylor came to the door, the officers were faced with a frail woman in her forties, 5'1" tall, and weighing 100 pounds. The events which followed in the Taylors' living room are the focal point of this case and are disputed by the parties.

The detectives announced themselves to Mrs. Taylor as police officers and informed her that she had been identified as a person who used stolen credit cards. The officers contend that they then asked Taylor if they could see her pocketbook, though Taylor testified at her deposition that they commanded her to produce the pocketbook for inspection. Mrs. Taylor says she then instructed her son to fetch the pocketbook from her bedroom, and he returned with it within a minute. Mrs. Taylor dumped most of the pocketbook's contents on a chair, leaving only her wallet in the purse. J.T. left the room at this point. Mrs. Taylor stated that one of the detectives then reached into her pocketbook and flipped through the wallet, presumably searching for stolen credit cards. She also testified that the detectives removed the wallet from her purse and further probed its contents. The officers contend that they never reached into the pocketbook and never looked at the credit cards. They claim that, at most, Detective Farmer helped to pull the purse open. J.T. stated in his deposition that the detectives were flipping through the wallet when he returned to the living room.

Nothing in the inspection of the wallet served to incriminate Mrs. Taylor in any way. The officers nonetheless instructed Taylor that they had probable cause to arrest her, and, according to Mrs. Taylor, that she would be taken downtown if she did not consent to having her photograph taken. Although Mrs. Taylor was hesitant to submit, she eventually permitted the officers to take the picture. Mrs. Taylor stated in her deposition that, from both her voice and expression, it was clear that she did not want to be photographed. Taylor's son noted that near the end of the thirty-minute encounter, his mother informed the detectives that her blood pressure was rising and that she needed air. J.T. testified that the detectives responded by engaging the Taylors in small talk, rather than by attempting to assist his mother.

After the events of August 31, 1991, Mrs. Taylor began to feel increasingly ill. Only two days later, she started to feel weak and began experiencing severe pains in her stomach and left leg. Mrs. Taylor also suffered from blurred vision and loss of motor control during the days following the encounter. On September 17, 1991, she was hospitalized. Physicians at the hospital determined that Taylor suffered a cerebral hemorrhage, or a stroke, which at least two physicians now attribute to her encounter with Detectives Farmer and Leonard. Subsequent to filing her complaint in this case, Mrs. Taylor passed away. Her husband, James Taylor, acting as administrator of her estate, has replaced Mrs. Taylor as named plaintiff.

Mrs. Taylor brought this action seeking damages from Detectives Farmer and Leonard for violation of her rights under 42 U.S.C. § 1983. Taylor also invoked the court's pendent jurisdiction for consideration of numerous state law remedies. On summary judgment, the district court granted the detectives' motion with respect to some of Taylor's claims. However, it denied the officers' motion for summary judgment on the basis of qualified immunity from § 1983 liability, and the detectives now appeal. *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

## II.

■ In recognition of the complex task performed by law enforcement officials, the Supreme Court has held that officers are entitled to a qualified immunity from civil liability under 42 U.S.C. § 1983. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow,* the Court stated that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Immunity from civil liability obtains so long as official "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The Supreme Court's decisions place a special emphasis on the reasonableness of an officer's actions, requiring courts to make an objective inquiry into the facts facing the officer at the time of the alleged improper act. *See Harlow,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39. The objective nature of the inquiry is designed both to limit exhaustive inquiries into an individual officer's subjective state of mind, *id.* at 816–17, 107 S.Ct. at 2737–38, and to safeguard the general interests of law enforcement from the intrusions of extended litigation, *see Hunter v. Bryant,* —— U.S. ——, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

■ Because of these concerns, courts reviewing questions of qualified immunity should attempt to put themselves in the place of the officers at the scene and view events as "a police officer acting reasonably under the circumstances should have perceived [them]." *Sevigny v. Dicksey,* 846 F.2d 953, 957 (4th Cir.1988). The crucial question is not what hindsight may uncover, but what information the officers had in hand or could reasonably be expected to possess. Because police officers are regularly forced to make critical decisions under extreme time pressure—decisions which may seem much easier after facts have unfolded and time for reflection has been afforded—reasonable judgments which turn out to be mistaken are nonetheless entitled to protection.

## III.

■ Detectives Farmer and Leonard invoke all of the preceding principles in support of their summary judgment motion. The detectives claim that actions alleged to have violated Mrs. Taylor's rights, such as inspection of her pocketbook and detention of Taylor in her home, were reasonably and unobtrusively conducted as part of a felony investigation. The officers argue that they were responding to the facts before them, including the identification of a suspect by Rosalind Davis at the Bootleggers store. Although Mrs. Taylor may have been innocent, the detectives assert, they had probable cause to arrest her and cannot be faulted for acting on the information then available to them. The detectives maintain that this case is no different from our recent decision in *Gooden v. Howard County,* 954 F.2d 960 (4th Cir.1992) (en banc), where we held that officers were protected from civil liability when they detained an individual for evaluation after the officers heard loud screams and thumping noises apparently emanating from her apartment.

The facts of *Gooden* are very different, however, from those of this case, and a comparison of the two cases is instructive. First, the officers in *Gooden* conducted personal investigations which corroborated independent eyewitness reports. In *Gooden,* the officers themselves heard harrowing noises, including a "long, loud blood-chilling scream," which appeared to be coming from Ms. Gooden's apartment. *Id.* at 962. The officers' observations were similar to those of neighbors who had complained of such disturbances. *Id.* at 963. In the case before us, however, the detectives' observations and previous eyewitness reports were contradictory, not corroborative. A store clerk had described the suspected card user to the detectives as a woman in her twenties, about 5′7″ tall, weighing approximately 150 pounds, and wearing a lot of jewelry. Yet, when the officers confronted Mrs. Taylor at her home, they found she was a frail woman in her forties, 5′1″ tall, and weighing no more than

100 pounds. Nonetheless, the officers continued their investigation, questioning Mrs. Taylor for thirty minutes. Detectives Farmer and Leonard now contend that Rosalind Davis' description of the suspect matched Mrs. Taylor's characteristics, but they have failed to include Ms. Davis' description in the record before us. The detectives also contend that Mrs. Taylor's weakened physical condition, which was in fact due to her dialysis, was suggestive of drug use. The bearing of such an observation on the crime of credit card theft, however, is uncertain.

A second important distinction involves the lack of exigent circumstances in this action. The latitude accorded police conduct is inescapably influenced by the need for prompt action in the interest of personal or public safety. In *Gooden,* the officers were investigating an ongoing disturbance in which screaming and loud thuds were heard from within an apartment. The officers there believed that someone was being hurt, and after interviewing Ms. Gooden, they concluded that they needed to take action for her own or her neighbors' safety. *Id.* at 964. Simply put, the officers had to act quickly to ensure that no one would be injured. This case, to the contrary, centers on a prolonged encounter with a physically unimposing woman in her forties. Mrs. Taylor clearly presented no threat to herself, to her neighbors, or to the officers in her living room.*

■ A third distinction centers on the amount of care exercised by the investigating officers. In *Gooden,* the officers travelled to the troubled apartment complex in the regular course of their police duties on two separate occasions. *Id.* at 962. They undertook personal investigations, eyewitness interviews, and two conversations with Ms. Gooden herself before taking her in for evaluation. *Id.* at 962–63. The facts here suggest that Detectives Farmer and Leonard employed a less careful approach. The detectives chose to undertake this credit card theft

investigation despite their placement in Richmond's narcotics division. This unusual situation arose, most likely, because of Detective Leonard's intense personal interest in the outcome of the case. On August 31, 1991, when the Bootlegger's clerk contacted the officers, they travelled from an ongoing narcotics investigation in South Side Richmond to the store's location in Henrico County. When the detectives later arrived at the Taylor home, their eagerness to apprehend a suspect may well have led them to overlook the fact that they were seeking an individual much younger, much taller, and much heavier than Mrs. Taylor. Ignoring these differences is problematic because "[a] police officer may not close her or his eyes to facts that would help clarify the circumstances...." *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986). A jury could find that Detectives Farmer and Leonard did just that.

■ Finally, in *Gooden* the officers could not have been on notice that their conduct was unlawful, if indeed it was, because the standard for seizing a suspect for psychiatric evaluation was unclear. *Gooden,* 954 F.2d at 968. Because the officers in *Gooden* were working in an area with relatively untested legal norms, it would be difficult to find that they had "violate[d] clearly established statutory or constitutional rights." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Here, by contrast, the officers' conduct was governed by the more settled standards for the search of property and seizure of a suspect. *See, e.g., Illinois v. Gates,* 462 U.S. 213, 230–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983). We recognize that those standards do not require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable

---

* Exigent circumstances can be found as well where there is a risk that evidence will be destroyed. In this case, however, spoliation of evidence does not appear to be a significant concern. If Mrs. Taylor's testimony that her son retrieved her pocketbook from upstairs is credited, there would be no reason to suspect that any

credit cards would be removed from the wallet after it was given to Mrs. Taylor. On the other hand, if the jury believes Detective Farmer's testimony that Mrs. Taylor retrieved the pocketbook herself, it would still be the case that she would have removed any stolen credit cards before returning to the living room with the pocketbook.

cause. Drawing reasonable conclusions from unclear circumstances is different, however, from playing a poor hunch. In this case, we think a reasonable jury could conclude that no reasonable officer could have believed his conduct to be lawful. *See Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039.

### IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*