[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The principal issue in this case is whether the conduct of the defendants, who are New Haven police officers, violated the plaintiff's civil rights in contravention of 42 U.S.C. § 1983. For "§ 1983 claims" concurrent jurisdiction exists between federal and state courts. Zizka v. Water PollutionControl Authority, 195 Conn. 682, 687 (1985). Also the complaint includes several state or common law causes of action, namely: false imprisonment, intentional infliction of emotional distress and negligence on the part of the defendants. In their answer to the plaintiff' civil rights claim, the defendants admit that they were acting "under color of law" but deny the remainder of the allegations. The answer effectively denies all of the remaining claims. Also asserted are the following four special defenses applicable to some or all of the counts: the complaint fails to state a claim upon which relief may be granted; the defendants are entitled to qualified immunity; the doctrine of governmental immunity releases the defendants from liability; and contributory or comparative negligence on the part of the plaintiff.
In many, if not most, respects, contradictory testimony was offered by witnesses for each side concerning the incident that gave rise to this case. The facts set forth below, therefore represent the court's findings from the evidence as well as its determination of the credibility of the various witnesses. Statev. Jackson, 239 Conn. 629, 634-35 (1997).
 I.
On August 21, 1993, the New Haven Police Department received a telephone call that a young lady had been beaten and a car set afire at 99 Lawncrest Road in the Westville section. Daniel Minor, the alleged perpetrator, was reported to have made several telephone calls threatening to return to burn the residence and to kill everyone in it. The description of Minor given to police was: white male, 25 years old, 5 feet 9 inches in height, 200-210 CT Page 7651 pounds in weight, clean shaven, light brown hair balding in back, last seen wearing a red shirt, dark shorts and no shoes. Minor was reported to be driving a brand new light blue Ford Tempo with Massachusetts plates.
After receiving the information concerning Daniel Minor, his actions, his description and his threats, the supervisor of the defendant Allan Turechek decided to have Turechek and the other defendant Gregory Catania conduct a stakeout in the vicinity of 99 Lawncrest Road. The two defendants dressed in duty uniforms but using an unmarked police car parked it in a driveway facing the intersection of Green Hill Terrace with Lawncrest Road. 99 Lawncrest Road is across the street from where the stakeout vehicle was parked.
In the evening of August 21, 1993, the plaintiff was in the company of his then girl friend Jessica Frisco. She drove him in her father's car, a small blue Geo two-door with Connecticut plates, to the apartment of a female friend on Cooper Place in the Westville section where they ate dinner. After dinner, Frisco and her friend drove to a bar where Frisco remained for a period of time. The plaintiff was left in the apartment to baby-sit the friend's young son. At some time on August 21, 1993, the plaintiff had consumed two beers.
Frisco returned to the apartment, picked up the plaintiff and started to drive to her parent's home in Bethany. In the Geo, they began to argue about the amount of time that Frisco had spent at the bar. The argument continued as the car turned from Lawncrest Road into Green Hill Terrace. While on Green Hill Green Terrace and in the defendants' view, Frisco stopped the Geo and ordered the plaintiff to get out.
When the plaintiff left the Geo, it was 10:45 P.M. It was dark out of course, but the neighborhood is urban with one-family homes. The plaintiff was 20 years old, was wearing a tank top sleeveless shirt, long pants, shoes and a baseball cap. The plaintiff weighed about 170 or 175 pounds, was clean shaven, and had a full head of hair. The plaintiff started to walk on Green Hill Terrace in the direction of Lawncrest Road and toward the driveway where the defendants' vehicle was parked. When the plaintiff reached the fence around the corner lot, the defendants left their car, called out that they were the police, ran across Lawncrest Road and pushed the plaintiff against the fence where he remained with his arms and legs spread as the defendants CT Page 7652 frisked him on the mistaken assumption that he was Daniel Minor. Officer Turechek recalled that he used both hands when he propelled the plaintiff to the fence. Frisco exited her car but quickly reentered when one or both of the defendants yelled at her to do so. No questions were asked of the plaintiff before the frisk or pat-down was completed. After the frisk, Officer Turechek found a driver's license or other identification information in the plaintiff's rear pocket. At that point, the defendants knew that the plaintiff was not "their man" and they directed him to return to Frisco's car. Turechek's comment to Catania, in the presence of the plaintiff, was that "we had f___ed up our stakeout."
As the plaintiff walked back to Frisco's vehicle, he heard one of the defendants say "run". The plaintiff ignored the command and continued to walk. The defendants then had a change of mind. Both of them followed the plaintiff to the Geo. Before leaving the area of the fence, the plaintiff had informed the defendants that the reason he was walking on the street was that he and his girl friend had an argument.
The reason given by the defendants for following the plaintiff to Frisco's car was to investigate the possibility of domestic violence. In addition to the plaintiff's disclosure of the argument, the defendants claimed to have heard a "bang" before the Geo turned from Lawncrest Road into Green Hill Terrace. Moments later, according to their testimony, they heard a feminine voice saying "No, baby don't do it" or "No, don't do it". When talking to Frisco and the plaintiff, however, the defendants never mentioned the "bang". As for the statement, Frisco, when testifying was not asked about it and the plaintiff denied that the statement was ever made. The statement, if it were made, would have been at compete variance with her attitude when she ordered the plaintiff to leave her vehicle.
When they reached the Geo, Officer Turechek went to the driver's side and Officer Catania went to the passenger's door where the plaintiff was standing. If, after the frisk was completed, the plaintiff had been released from police custody, he was apparently again, in custody as he stood on the passenger side of the Geo. In this regard, Catania's testimony was to the effect that from the time that we stopped the plaintiff he was not free to go until we checked out whether abuse had occurred between him and Jessica Frisco. Some conversation occurred between the plaintiff and Catania and perhaps Frisco. Catania CT Page 7653 recalled that the plaintiff said that he and Frisco were coming from the Cape Codder, a local bar, whereas Frisco's statement was that they had been at a friend's house. Catania characterized the plaintiff's attitude as "somewhat arrogant" and said that he smelled liquor on the plaintiff's breath. As the plaintiff turned away from Catania to open the passenger door, Catania pushed him so that the plaintiff fell against the rear window breaking it with the result that there were cuts on his right shoulder and upper arm and causing further injuries that are later described.
A major point of dispute at the trial was whether the rear passenger window shattered as testified to by the plaintiff and Frisco and as shown by photographs in evidence or whether the window just cracked with the cracks forming a spider web pattern which was the claim of the defendants. The court's finding is that the impact of the plaintiff's body against the window caused it to shatter so that particles of glass were lodged in the plaintiff's upper arm and portions of glass fell into the rear seat and floor of the car. Otherwise, there is no explanation for the removal of glass fragments from the plaintiff's arm at the emergency room of Yale New Haven Hospital on August 21, 1993. Also Catania had written in his incident report wrote that "[the plaintiff's] shoulder broke the rear passenger window" and Turechek testified that "[d]ue to the window being broken we had to call our supervisor to come and speak with Mr. Weyel and Miss Frisco." The supervisor was Sergeant (now lieutenant) Tinker. He spoke with Frisco and the Plaintiff and looked at the area of the rear passenger window. At the trial, however, Tinker did not remember anything about the window.
Following their discussion with Sergeant Tinker, Frisco and the plaintiff drove to New Haven Police Headquarters to file a complaint. The complaint was not filed because no one from the Internal Affairs Unit was at headquarters at that late hour to receive it. From the police station Frisco and the plaintiff went to the emergency room at Yale-New Haven Hospital where blood was wiped from the plaintiff's right shoulder and arm and small pieces of glass were removed from his upper right arm. When the glass was removed, the plaintiff exhibited pain. There were stains from the plaintiff's blood in the Geo.
The plaintiff, when pushed by Officer Catania sustained injuries in addition to the cuts and the lodging of glass particles in his upper right arm. His head hit the roof of the Geo. A nerve in his neck was pinched. Shortly after the incident CT Page 7654 the plaintiff began to experience pain in his upper and lower back, right shoulder and knee and headaches all of which became aggravated by his then occupation as a vacuumer at a car wash. The plaintiff's back had been injured in a motor vehicle accident that happened in 1991 but from that earlier occurrence no impairment existed prior to the encounter with Officer Catania. Dr. O'Donnell's persistent diagnosis was that the plaintiff was suffering from an acute post-traumatic musculoskeletal musculoligamentous sprain strain of the cervical and lumbar spine regions with associated muscular pain and contraction. A sprain involves injury to ligaments and a strain denotes injury to muscles. Headaches can be produced by nerve involvement.
Because of the persistency of the plaintiff's headaches Dr. O'Donnell referred him to Dr. Arthur Seigal a neurologist. Doctor O'Donnell testified that Dr. Seigal, who saw the plaintiff once and had x-rays taken, agreed with his diagnosis. In Dr. O'Donnell's opinion, with which the court, agrees, the plaintiff's injuries were directly and causally related to his encounter with Officer Catania
The plaintiff was under Dr. O'Donnell's care from April 4, 1994 until released on January 26, 1996. Treatment consisted of electrical muscle stimulation, chiropractic manipulative therapy and soft tissue massage. A home exercise program was also recommended. In terms of permanency, Dr. O'Donnell ascribed a 5% permanent partial impairment to the lumber spine and a 7.5% permanent partial impairment to the cervical spine. As with the issue of causation, the court agrees with Doctor O'Donnell's permanency ratings based as they are on the continual pain and stiffness, loss of motion and headaches. The plaintiff has curtailed lifting heavy objects, pulling things and bending at the waist. His present employment as assistant manager at Valveline Instant Oil Change does not require him to lift, pull or bend. The plaintiff's hospital and medical bills are Yale-New Haven Hospital $205.00, Dr. Seigal $795.00 and Dr. O'Donnell $4,350.00. No claim was made for lost wages.
In terms of non-economic damages, the plaintiff testified that the entire episode from the pat down at the fence to the shattered car window was an experience in fear, humiliation and a loss of dignity. His attitude toward the police, from the time of the incident to the present, is that "he would never trust them."
II.
CT Page 7655
42 U.S.C § 1983 the source of the plaintiff's first cause of action reads in pertinent part as follows:
 Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.
To establish his claim under § 1983 the plaintiff must show that the defendants while acting under the color of law deprived him of a right secured by either the Constitution or laws of the United States. Gomez v. Toledo, 446 U.S. 635, 638,100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The first requirement that the defendants acted under the color of law was satisfied by the admission in their answer. See Pedersen v. Vahidy, 205 Conn. 510,519-20 (1989). The second question obviously involves rights governed by the Fourth Amendment. See Baker v. McCollan,443 U.S. 137, 142, 99 S.Ct. 2689, G1 L.Ed.2d 433 (1979).
Not every tort claim translates into a violation of federal rights, privileges and immunities. Government officials such as the police who perform discretionary functions are generally shielded from civil liability except where their conduct violates clearly established Constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818,102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether the rights asserted by the plaintiff were clearly established when the incident occurred, the court must consider: whether the right in question was defined with reasonable clarity or specificity; whether the existence of the right is supported by the decisional law of the Supreme Court of the United States or the Court of Appeals for the Second Circuit and whether under pre-existing law a reasonable defendant-official would have understood that the acts complained of were unlawful. Soares v. Connecticut,8 F.3d 917, 922 (2d Cir. 1993). A right which meets any one of the three criteria is considered to be clearly established. Cook v.Sheldon, 47 F.3d 73, 78 (2d Cir. 1994).
In the court's view the plaintiff's claims of Fourth CT Page 7656 Amendment deprivations are based on rights that were clearly established by Terry v. Ohio, 392 U.S. 1, 88 S.Ct 1868,20 L.Ed.2d 889 (1968). Terry, 392 U.S. at 29 32 legitimated the concept of "stop and frisk" thus authorizing the limited pat-down for weapons when based upon articulable suspicion that criminal activity may be afoot or that a crime has been committed. UnitedStates v. Hensley, 469 U.S. 221, 228, 105 S.Ct 675,83 L.Ed.2d 604 (1985); United States v. Cortez, 449 U.S. 411, 417 n. 2.101 S.Ct 690 66 L.Ed.2d 621 (1981). Terry, supra, 392 U.S. at 16
emphasized, however, that a seizure occurs whenever a police officer stops a person and restrains his freedom to move away. And that a search happens whenever the outer surfaces of clothing are explored in an attempt to locate weapons. The Fourth Amendment applies to all seizures of the person, including those that involve only a brief detention. United States v.Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct 2574, 45 L.Ed.2d 607
(1975).
Like probable cause, its relative, articulable or reasonable suspicion is not susceptible to an easy definition. United Statesv. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Probable cause has been described as "exist[ing] when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a crime has been committed." State v. Corbuzzi, 161 Conn. 371,376 (1971), cert. denied 404 U.S. 1017, 92 S.Ct 677,30 L.Ed.2d 664 (1972). Reasonable suspicion, a less demanding standard requires only some minimal level of justification for making the stop. INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758,80 L.Ed.2d 247 (1984). In determining whether that level has been reached, the totality of the circumstances and the reasonable inferences from the facts that the police officer is entitled to draw based on his experience must be considered. United States v.Sokolow, supra, 490 U.S. at 7.
In light of the positions taken by the parties, another aspect of Terry v. Ohio merits discussion before the court rules on the validity of the defendant's seizure and search of the plaintiff by the fence on Green Hill Terrace. The holding inTerry, supra 392 U.S. at 30, talks about a police officer making reasonable inquiries before conducting the limited search for weapons. The making of reasonable inquiries aimed at confirming or dispelling the police officer's suspicions appears again inMinnesota v. Dickerson, 508 U.S. 366, 373 113 S.Ct. 2130, 124 CT Page 7657 L.Ed.2d 334 (1993). A request from the defendants for identification from the plaintiff or even a request that the plaintiff remove his baseball cap so that the defendants could see whether he, like Dan Minor, was balding could well have prevented the entire episode.
Perhaps it is noteworthy that Justice White, whose concurring opinion in Terry, supra, 392 U.S. at 34 emphasized interrogation during an investigative stop wrote for the court in Minnesota v.Dickerson. This court, however, has found no decision mandating interrogation, as a matter of law, before the police conduct a pat-down search. Especially where, as here, the party for whom the police were looking was reported to be returning with a weapon. In such a situation, attention must be directed to language that appears in Justice Harlan's concurring opinion inTerry. "There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime should have to ask one question and take the risk that the answer might be a bullet." 392 U.S. at 33.
The details of the differences in physical appearance between Daniel Minor and the plaintiff are set forth in the factual findings. Differences of 5 years in age, 30-35 pounds in weight, a greater amount of hair under the defendant's cap, a similar but different car with different license plates and a companion are, in the court's opinion, insufficient to make the defendants' investigatory stop an unreasonable one given the lateness of the hour and the information the police had received. The differences in appearance and the circumstances in this case simply do not measure up to those reported in Taylor v. Farmer, 13 F.3d 117,120-21 (4th Cir. 1993). In two decisions cited by our Supreme Court in State v. Mitchell, 204 Conn. 187, 196 (1987). the District of Columbia Court of Appeals said "We have never required precise correlation between a victim's description and the actual appearance of a suspect. District of Columbia v. M.M.,407 A.2d 698, 701 (1979); In the Matter of J.G.J., 388 A.2d 472,474 (1978).
Probable cause to arrest or, in the case of an investigative stop, reasonable suspicion determines whether even a wrong person can be validly placed in custody. Baker v. McCollan,443 U.S. 137, 145, 99 S.Ct 2689, 1 L.Ed.2d 433 (1979); Blackwell v.Barton, 34 F.3d 298, 303 (5th Cir. 1994). Compare Baker v.McCollan, supra (wrong person arrested pursuant to a facially valid warrant) and Hall v. California 401 U.S. 797, 804, 91 S.Ct. CT Page 7658 1106, 28 L.Ed.2d 484 (1971) (evidence admitted from search incident to arrest where another person was erroneously arrested in Petitioner's apartment) with Taylor v. Farmer, supra13 F.3d at 121 (police officers' motion for summary judgment on the basis of qualified immunity rejected because under the circumstances a jury could find that no reasonable officer would have believed that his conduct was lawful); Cook v. Sheldon, supra41 F.3d at 79 (no probable cause to arrest a passenger for the crime of possessing a vehicle from which the VIN plate had been removed and Winfield v. United States, 430 F. Sup. 912, 914 (S.D.N Y 1977) (damages awarded to the plaintiff who was arrested solely because he looked like the person named in the warrant). Because reasonable suspicion existed when the plaintiff was stopped and frisked, neither Turechek nor Catania are liable civilly for their conduct in this aspect of the case. Moreover, Fourth Amendment jurisprudence recognizes that the right to make an arrest or an investigatory stop necessarily includes the right to use some degree of physical coercion or threat thereof to effect it. Graham v. Conner, 490 U.S. 386, 396, 109 S.Ct. 1865,104 L.Ed.2d 443 (1989).
A different result, however, has been reached regarding Officer Catania's subsequent push of the plaintiff. In making its decision, the court has considered both the plaintiff's claim of excessive — force and Catania's defense of qualified immunity. To establish an excessive — force claim, the plaintiff's burden was to prove that the force used by Officer Catania was objectively unreasonable under Fourth Amendment standards. Graham v. Connor,supra, 490 U.S. at 398. Objective reasonableness means that an officer's conduct is to be decided in the light of the facts and circumstances confronting him without regard to his subsequentive intent or motivation. Id; Albright v. Oliver, ___ U.S. ___,114 S.Ct. 807, 811 127 L.Ed.2d 114 reh. denied 114 S.C.T (1994). Whether the force used was reasonable or excessive is to be judged from the perspective of a reasonable officer at the scene and should take into account the facts and circumstances of the particular case, the severity of the crime at issue and whether the suspect posses an immediate threat to the officer or others or is actively resisting arrest or attempting to flee. Graham v.Connor, supra, 490 U.S. at 396. By contrast, to establish the qualified immunity defense, a police officer must plead it, Gomezv. Toledo, supra 446 U.S. at, 640 and prove that his conduct satisfied one of two tests: either that his conduct did not violate "clearly established Constitutional rights" of which a reasonable person would have known, or that it was "objectively CT Page 7659 reasonable" to believe that his acts did not violate those clearly established rights. Finnegan v. Fountain, 915 F.2d 817,823 (2d Cir. 1990).
At least since Terry v. Ohio, supra, 392 U.S. at 9, an individual has had the expressly declared Constitutional right to freedom from interference with his person except where plainly authorized by law. As a practical matter, Catania, when standing in close proximity to the plaintiff alongside Frisco's car, was limited to the second alternative. Qualified immunity would protect him from damages if he established that when he pushed the plaintiff, it was objectively reasonable for him to believe that his action was permissible and not an excessive use of force or that officers of reasonable competence could disagree as to the permissible nature of his action. Golino v. City of NewHaven, 950 F.2d 864, 870 (2d Cir. 1991).
With its emphasis on reasonableness, qualified immunity is defined essentially in objective terms. As several Supreme Court opinions have said, the definition balances the interest of the public in the deterrence of unlawful conduct and the protection of victims' rights against police officers' actions which, when clearly defined rights are not involved, are better taken with independence and without fear of consequences or reprisals.Harlow v. Fitzgerald, 457 U.S. 800, 821, 102 S.Ct 2727,73 L.Ed.2d 396 (1982); Pierson v. Ray, 386 U.S. 547, 554,87 S.Ct 1213, 18 L.Ed.2d 288 (1967).
As found by the court, Officer Catania pushed or shoved the plaintiff from the side or rear as the plaintiff was standing where the defendants had ordered him to be and after the just accomplished stop and frisk had shown him to be free of weapons. The offense being investigated, according to the officers was the possibility of domestic violence of which the only evidence was the plaintiff's admission that he was on the street because of an argument with his girl friend. Even if the defendants had a right to detain the plaintiff, they had no right to push or shove him. In the court's opinion, the force used by Officer Catania was unreasonable, Jonelis v. Russo, 863 F. Sup. 84, 87 (D.Conn. 1994) and the unlawfulness of his conduct was apparent in the light of pre-existing law. Anderson v. Creighton, 483 U.S. G35, 640, 107 S.Ct 3034, 97 L.Ed.2d 523 (1987).
The defendants did not attempt to justify Officer Catania's push as described above. Their stance was that the particular CT Page 7660 push or shove never happened. Instead, their contention was that the plaintiff fell when he walked into Catania's outstretched left arm and hand. The following supplemental finding shows the defendants' version of what occurred on the passenger side of Frisco's Geo. Officer Catania and the plaintiff were standing in close proximity to each other. The plaintiff moved toward Officer Catania who put up his left arm so that the palm of his left hand with fingers upright and closed was facing the plaintiff. If there were a push, it was done with Officer Catania's raised finger tips. To the court, it was highly improbable that contact with raised fingertips could have promoted the damage and injuries that have been found. The court did not credit the defendants' version of the incident.
 III
Certain issues in the complaint i.e. false imprisonment, intentional infliction of emotional distress and negligence on the part of the defendants' are not mentioned in the plaintiff's brief. As separate torts, these allegations are, therefore, considered to have been abandoned. Gaynor v. Union Trust Co.,216 Conn. 458, 482 (1990), Timberland Development Corp v. Planningand Zoning Commission, 43 Conn. App. 606, 610 (1996). The plaintiff, however can recover for emotional distress attributable to Officer Catania's Fourth Amendment violation.Glasson v. City of Louisville, 518 F.2d 899, 912 (6th Cir.), cert. denied 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975).
The plaintiff contends that Turechek and Catania are jointly and severally liable for each other's conduct. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose Constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9,11 (2d Cir. 1988); Jonelis v. Russo, supra, 863 F. Supp at 87. The difficulty in applying this principle to Turechek comes from doubt as to whether Catania pushed the plaintiff in Turechek's presence. When the plaintiff was pushed, Turechek was on the other side of the Geo talking to Frisco. Although at the trial, Turechek's recitation of what occurred conformed substantially to Catania's account, the court attributes the similarity to Turechek's desire to aide a fellow officer rather than to what he had actually seen.
IV
CT Page 7661
In the plaintiff's action against Officer Allen Turechek, judgement is rendered for the defendant. In the plaintiff's action against Gregory Catania, judgement is rendered for the plaintiff. Compensatory damages in the amount of $22,000.00 are awarded for the costs of the plaintiff's medical and rehabilitative care, his permanency losses in the cervical and lumbar areas of the spine, his pain and suffering and for his emotional distress.
In addition, the sum of $2,200.00 is awarded as punitive damages because of Officer Catania's willful disregard of the plaintiff's civil rights. Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996). The ten percent relationship between the punitive and compensatory awards is certainly an appropriate ratio. See BMW ofNorth America, Inc., v. Gore, ___ U.S. ___, 116 S.Ct. 1589, 1601,134 L.Ed.2d 748 (1996). In sum, either Officer Gregory Catania or the City of New Haven pursuant to its duty to indemnify, §7-101a, shall pay the sum of $24,200.00 to the plaintiff.
Pursuant to the parties' agreement, a separate hearing shall be held to award costs, including Dr. O'Donnell's fee for testifying, and an attorney's fee.
Jerrold H. Barnett Judge of the Superior Court