**Robert B. MARTIN, Plaintiff,**

v.

**POMEROY COMPUTER RESOURCES, INC., Defendant.**

**Lanetca, Inc., and Robert B. Martin, Plaintiffs,**

v.

**Pomeroy Computer Resources, Inc., Defendant.**

**Pomeroy Computer Resources, Inc., Plaintiff,**

v.

**Robert Martin, and Lanetca, Inc., Defendants.**

Nos. 5:98CV16, 5:98CV33, 5:98CV108.

United States District Court, W.D. North Carolina, Statesville Division.

July 27, 1999.

---

Eloise Bradshaw, David W. Hood, Gary F. Young, Hickory, NC, for Robert B. Martin & Lanetca, Inc.

J. Samuel Gorham, III, Hickory, NC, Kevin L. Murphy, Peggy Murphy Barker, Thomas C. Lyons, Covington, KY, for defendant Pomeroy Computer.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THESE MATTERS** are before the Court on the motion for partial summary judgment of Lanetca, Inc. (Lanetca) and Robert Martin (Martin). For the reasons stated below, the motion is denied.

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact

and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, Pomeroy Computer Resources, Inc. (Pomeroy). *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Martin and Lanetca have an initial burden to show a lack of evidence to support Pomeroy's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to Pomeroy who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for [Pomeroy]." *Id.* Moreover, in considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to Pomeroy, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

Prior to October 1996, Martin was the sole shareholder and president of Community Technologies, Inc. (CTI) which operated under the trade name "Dilan." Dilan sold microcomputer products and provided networking services. Pomeroy is also in the business of selling computer products.

On October 11, 1996, Pomeroy purchased CTI's assets for a sum approaching $4 million pursuant to an Asset Purchase Agreement (APA). CTI later became known as Lanetca and Martin remains its sole shareholder. The APA provides that the transaction is based on "the representations, warranties, covenants, indemnifications, assurances and undertakings of Seller [CTI] and Shareholder [Martin] and of Purchaser [Pomeroy] contained in this Agreement." **Exhibit A, Asset Purchase Agreement, *attached to* Martin and Lanetca, Inc.'s Memorandum in Support of Motion for Partial Summary Judgment** ["Supporting Memorandum"]. As part of the purchase price, Pomeroy gave a promissory note to CTI in the amount of $904,592.68 to be paid in three yearly installments. **Exhibit B, Amended and Restated Subordinated Promissory Note, *attached to* Supporting Memorandum.** Also included in the APA are representations by Martin and CTI that "there are no Actions or Disputes pending or threatened against or affecting (directly or indirectly) the Seller [CTI] or its property or assets, nor are there any facts or conditions which exist which would give rise to any such Actions or Disputes which, if determined adversely to Seller, would have a material adverse effect upon Seller's Business." **Asset Purchase Agreement, at ¶ 7.13.** The APA provided that as "an inducement for and in consideration of Purchaser entering into this Agreement, Seller [CTI] and Shareholder [Martin] agree to enter into a Covenant Not to Compete Agreement, in the form of Exhibits "B" and "B–1," respectively, attached hereto and made a part hereof." *Id.*, at ¶ 9.1. An Employment Agreement between Pomeroy and Martin was incorporated into the APA pursuant to which Martin was the vice president of operations for Pomeroy's Dilan division for an initial term of three years. **Exhibit G–1, Pomeroy Computer Resources, Inc. Employment Agreement, *attached to* Asset Purchase Agreement, at ¶'s 2, 4.**

Pomeroy maintains both CTI, now doing business as Lanetca, and Martin breached the covenant not to compete and failed to disclose the existence of litigation against Dilan for alleged misappropriation of proprietary technology. As a result, payment under the promissory note has not occurred. Lanetca argues that under the terms of the promissory note, it is entitled to payment in any event and Pomeroy has defaulted.

Contained within the provisions of the note are the following paragraphs:

This Note is issued pursuant and subject to the terms and conditions of the Asset

Purchase Agreement. This Note is subject to all terms and conditions set forth in the Asset Purchase Documents, including, but not limited to, terms of default and rights of acceleration, if any. The terms and conditions of said Asset Purchase Documents *are incorporated herein by reference.* Any holder of the Note is subject to all claims and defenses which the Borrower could pursue under the Asset Purchase Agreement.

. . . . .

Notwithstanding the above, pursuant to the Asset Purchase Agreement, Lender [CTI] made certain representations, warranties, covenants and agreements with and to the Borrower [Pomeroy]. Lender agrees that if the Borrower is entitled to indemnification from the Lender under the Asset Purchase Agreement or any other of the Asset Purchase Documents, *the amount of such indemnification due from Lender may be set off against the amount payable hereunder* if permitted under the Asset Purchase Agreement, being first applied to interest *and the withholding all or any part of payment due hereunder as a result of such a set off shall not be considered an Event of Default hereunder.* Lender agrees that the amount to which the Borrower may be entitled to recover from Lender shall not be limited by either the amount paid or due to be paid to Lender hereunder or by the terms of this Note but shall be governed by the terms of the Asset Purchase Documents.

**Amended and Restated Subordinated Promissory Note, at ¶'s 6, 8 (emphasis added).** The APA provides:

Seller [CTI] and Shareholder [Martin] *jointly and severally,* shall indemnify Purchaser [Pomeroy] against and hold it harmless from:

(i) any and all loss, damage, liability or deficiency resulting from or arising out of any inaccuracy in or breach of any representation, warranty, covenant or obligation made or incurred by Seller herein or in any other agreement, instrument or document delivered by or on behalf of Seller in connection herewith;

(ii) any imposition (including by operation of law) or attempted imposition by a third party upon Purchaser of any liability of Seller which Purchaser has not specifically agreed to assume pursuant to Section 3.2 of this Agreement. . . .

. . . . .

*Any amounts to which Purchaser . . . is entitled to indemnification pursuant to the provisions of this Section, . . . shall first be offset against the amount payable to Seller under the promissory note.*

**Asset Purchase Agreement, at ¶ 12.3 (emphasis added).**

Martin claims Pomeroy breached the employment agreement in January 1998, when Martin was terminated without cause due to "philosophical differences." As a result, he claims he is entitled to summary judgment. The employment agreement incorporated the non-compete provisions of the APA and included a prohibition against the disclosure of any confidential and proprietary information or trade secrets. **Exhibit G–1, *supra,* at ¶'s 8, 9.** It also provided for termination for cause on fifteen days' written notice. Cause is defined in the agreement as including

(i) the continuous failure by Employee to substantially perform his duties with the Company . . . after a written demand for substantial performance is delivered to him by the Company . . .; (ii) the engaging by Employee in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise, including but not limited to any material misrepresentation related to the performance of his duties . . .; (iv) Employee's gross neglect or gross misconduct in carrying out his duties hereunder resulting, in either case, in material harm to the Company; or (v) any material breach by Employee of this Agreement. . . .

*Id.*, at ¶ 10. Martin was not deemed terminated under the terms of the agreement until he had received a resolution of the Board of Directors and had been provided a thirty day period to cure his conduct. *Id.* In the event Martin was terminated without cause, he was to continue to receive compensation.

As noted above, simultaneously with the execution of the APA, the parties entered into a non-compete agreement which, for a five year period, prevented CTI [Lanetca] from soliciting Pomeroy's business or engaging in a competitive business in the nine states in which Pomeroy does business. **Plaintiff's Exhibit D,** *attached to* **Plaintiff's First Amended Complaint, filed in Case No. 5:98cv108.**

For unexplained reasons, the APA is governed by the law of North Carolina; the promissory note by the law of Ohio; the employment agreement by the law of Kentucky; and the non-compete agreement does not contain a choice of law provision.

### III. DISCUSSION

**A. Lanetca's motion for summary judgment on the promissory note.**

Pomeroy has refused to make payments on the note because of the failure to disclose litigation between CTI and a corporation known as Viable. Lanetca argues that even if it failed to disclose certain pending litigation, that action would not have a material adverse affect on the business and thus, under the terms of the APA, no breach of warranty occurred. **Asset Purchase Agreement at ¶ 7.13.** ("[T]here are no Actions ... pending ... against ... the Seller ... which, if determined adversely to Seller, would have a material adverse effect upon Seller's business.").

Viable sued CTI prior to the asset purchase for misappropriation of proprietary technology and violations of a non-disclosure agreement. **Settlement Agreement dated October 25, 1996,** *attached to* **Supporting Memorandum.** Viable and CTI reached an "agreement in principle" in April 1996 which was not reduced to writing or signed until after the closing of the asset purchase between Pomeroy and CTI. *Id.*, at 2. The settlement required CTI and another defendant, Fletcher Applied Sciences (FAS), to pay future royalties in the amount of six percent of the total sales for the product JacqCAD MASTER®. *Id.*, at 4. In return, CTI was given distribution rights for JacqCAD and these rights were one of the assets purchased by Pomeroy in the APA. **Asset Purchase Agreement, at ¶ 2.2(n)** ("**All rights of Seller in the JacqCAD Master Computer Program, all updates thereto and all rights of Seller under all license and distributor agreements entered into by Seller regarding such software**").

■ There is clearly an issue of fact concerning whether this litigation, and the true nature thereof, was disclosed. Martin claims that just days before the asset purchase closing, he wrote to Steve Pomeroy, an executive officer, to respond to questions concerning litigation. Martin maintains he advised Pomeroy that there was a

> suit that involves our *JacqCAD* MASTER product. *Viable says FAS, that we the get the product from[,] has violated their intellectual property rights.* I don't agree but FAS and DILAN settled to get on with business. We incur a small increase in our royalty for doing this, no other liability and FAS will split the cost. I hope to sign the settlement before our sale date to Pomeroy."

**Letter, dated October 8, 1996, from Martin to Steve Pomeroy,** *attached to* **Supporting Memorandum (emphasis added).** Contrary to the representation contained in the letter, the settlement agreement with Viable states that CTI was a named defendant. Moreover, Steve Pomeroy testified that he did not receive such a letter and learned of this litigation for the first time in 1997. **Deposition of Stephen Pomeroy, at 23.** Thus, a material issue of fact exists concerning whether the litigation was disclosed prior to the asset purchase. *Creech v. Melnik,* 347 N.C. 520,

530, 495 S.E.2d 907, 913 (1998) (**Summary judgment is "particularly inappropriate" where the "evidence is subject to conflicting interpretations.".**). Moreover, resolution of this fact may turn on a credibility assessment which defeats summary judgment. *United States v. Leak,* 123 F.3d 787, 797 (4th Cir.1997) (**Conflicting and different versions of the events involved in a lawsuit require a trial.**); *accord, Taylor v. Farmer,* 13 F.3d 117, 120–21 (4th Cir.1993); *Lorbacher v. Housing Authority of the City of Raleigh,* 127 N.C.App. 663, 673, 493 S.E.2d 74, 80 (1997).

Lanetca has another argument in support of the motion for summary judgment on the promissory note.[1] According to Lanetca, payment of the royalties reduces the gross profit on the JacqCAD product from 75 to 72 percent and thus, there is no material adverse affect on the business.[2] However, the owner of FAS, Garth Fletcher, testified that CTI owes him over $50,-000 in connection with the royalties, a sum which he is attempting to collect from Pomeroy. **Deposition of Garth Fletcher, *attached to* Pomeroy's Notice of Filing, at 105.** In addition, Pomeroy claims it has incurred substantial attorneys' fees in an attempt to resolve the issue of outstanding royalties with Viable. **Exhibit A, Affidavit of Davit Pomeroy, *attached to* Pomeroy's Memorandum in Response and Opposition to Motion for Partial Summary Judgment, at ¶ 4 ["Pomeroy Memorandum"].** Thus, the issue of whether the settlement with Viable had a material adverse affect on business is a question of fact for the jury. *Taylor, supra* (**Competing versions of evidence must be resolved by the jury.**); *Creech, supra; McClain v. Walker,* 124 N.C.App. 765, 769, 478 S.E.2d 670, 673 (1996).

In short, whether Pomeroy is entitled to offset damages involved in the Viable litigation against the promissory note depends on whether the jury finds there was no disclosure of the pending litigation and that the litigation had a material adverse affect on business. **Amended and Restated Subordinated Promissory Note, *supra* ("Lender agrees that if the Borrower is entitled to indemnification from the Lender under the Asset Purchase Agreement or any other of the Asset Purchase Documents, the amount of such indemnification due from Lender may be set off against the amount payable hereunder …".).**

██] Next, Lanetca and Martin argue that Pomeroy may not refuse payment under the terms of the promissory note on the ground that Martin breached the employment agreement and the covenant not to compete. This argument is based on a strained reading of the indemnification clause of the APA which provides that indemnification will be given for any damages resulting from breach of warranties or representations made by CTI. **Asset Purchase Agreement, at ¶ 12.3 ("Seller [CTI] and Shareholder [Martin] *jointly and severally* shall indemnify Purchaser [Pomeroy] against and hold it harmless from: … any and all loss … resulting from … any inaccuracy in or breach of any representation, warranty, covenant or obligation made or incurred by *Seller* …".) (emphasis added).** Martin and Lanetca argue that since Martin is alleged to have breached the non-compete and employment agreement, the indemnification clause does not come into operation.

However, the clause in its entirety provides that Martin and CTI are "jointly and severally" liable for any breaches by CTI. Thus, it is of no moment whether the conduct causing the breach was committed solely by Martin. CTI, *i.e.,* Lanetca, may

---

1. The ruling that summary judgment is inappropriate on the issue of whether the litigation with Viable was disclosed actually disposes of the second argument as well. It is briefly addressed in order to clarify that there will be a jury issue on this claim.

2. FAS and CTI had a "gentlemen's agreement" that each would pay half of the six percent royalty thus causing a reduction in profit to CTI of three percent. **Deposition of Garth Fletcher, *attached to* Pomeroy's Notice of Filing, at 101.**

be held liable under the terms of the indemnification clause. Moreover, Pomeroy has alleged that both Martin and Lanetca breached the non-compete agreement.

## B. Martin's motion for summary judgment on the employment agreement.

Martin claims he was terminated without cause and points to Pomeroy's failure to abide by the terms of the employment agreement as proof thereof. As noted above, that agreement provided for termination for cause on fifteen days' written notice. *See* Exhibit G–1, *supra*, at ¶'s 8, 9. Cause is defined as including

> (i) the continuous failure by Employee to substantially perform his duties with the Company ... after a written demand for substantial performance ...; (ii) the engaging by Employee in conduct which is demonstrably and materially injurious to the Company ...; (iv) Employee's gross neglect or gross misconduct in carrying out his duties hereunder resulting, ... in material harm to the Company or (v) any material breach by Employee of this Agreement....

*Id.,* at ¶ 10. Under the terms of the agreement, Martin would not be deemed actually terminated until he had received a resolution of the Board of Directors and had been provided a thirty day period to cure his conduct. *Id.* Martin claims he was terminated on January 8, 1998, without any prior notice and was never provided with a thirty day cure period. It is not disputed, however, that he was tendered his pay for the thirty day period following January 18, 1998.

Pomeroy responds that after the asset purchase Martin consistently failed to carry out his responsibilities as the vice-president of the Dilan division. Between April and September 1997, the Hickory branch of Dilan lost over a half a million dollars in income. Affidavit of David Pomeroy, *supra.* In September 1997, Martin was haled to a meeting with corporate executives in Kentucky concerning his performance. Deposition of Stephen Pomeroy, at 73. "We'[d], before that, had numerous discussions, whether it was myself or other members of senior management team regarding Rob's performance, the division's performance, the communication, the attitude. You know, it was that kind of a meeting to ... your job's on the line, and we've got to make some changes, consider yourself, you know, being put on notice." *Id.* This was not the first time Martin had been confronted; in fact, on a monthly basis some aspects of performance were reviewed. *Id.,* at 79. Instead of heeding the message, Martin defied corporate instructions to terminate a particular employee who was a personal friend. *Id.,* at 108–113.

In December 1997 Martin presided over a division dinner attended by management employees of all North Carolina branch offices. Exhibit D, Affidavit of Jeff Nye, *attached to* Pomeroy Memorandum. During his address to the audience, Martin was intoxicated and began a tirade concerning his control over the Dilan division despite the asset purchase. *Id.* Martin went through the room and forced each employee in attendance to say to him that he was "still the 'Boss.'" *Id.* He used obscenities and vulgar language and issued many threats to the employees. *Id.*

Martin also began a new business separate from Lanetca while employed by Pomeroy which was designed to take over the distribution of the JacqCAD product. Deposition of Angela Lee Gwaltney, *attached to* Pomeroy's Notice of Filing, at 27–35. Martin used Pomeroy's business premises, employees, and equipment to start up and operate this separate business. *Id.* In fact, Pomeroy had ordered Martin to terminate some of its employees; but, after their termination, Martin kept them on at Pomeroy's place of business where they worked on his separate business. *Id.* This was not the only separate business which he began or negotiated for while on Pomeroy's business premises.

In addition, Martin refused to follow directives from Pomeroy management. "Rob had a problem with answering to anyone, period." *Id.,* at 38. "Rob was in

charge. It didn't matter what Pomeroy thought...." *Id.,* **at 40.** After the asset purchase, Martin kept the Dilan company totally separate from Pomeroy by failing to advise the employees of any directives and failing to accept any support from Pomeroy. *Id.,* **at 66–68.**

On January 19, 1998, Martin was terminated. On February 20, 1998, the board of directors for Pomeroy issued a resolution terminating his employment for cause. Because the resolution was issued after Martin was asked to leave, he was tendered compensation for the interim thirty day period. The board found that Martin's conduct was so dangerous that it could not be cured and cited as examples insubordination, gross neglect resulting in material losses, and misappropriation of corporate funds. **Exhibit E, Pomeroy Computer Resources, Inc. Special Written Action by the Board of Directors,** *attached to* **Pomeroy Memorandum.**

█ Whether Pomeroy breached the employment agreement with Martin is a question of fact for the jury. Martin and Lanetca's citation to *Absher v. Illinois Cent. R. Co.,* 371 S.W.2d 950 (Ky.1963), is inapposite. That court held that the "rule referred to in [*Dalton v. Mullins,* 293 S.W.2d 470, 476 (Ky.1956) ], is that if one party has substantially breached a contract the other party's subsequent nonperformance of it will not prevent recovery by the latter. We do not believe the principle would apply to a contract that expressly requires claimed defaults to be submitted to a stated remedial procedure." *Absher,* 371 S.W.2d at 954. Pomeroy does not claim that Martin's breach of the employment agreement relieves it of its obligation to provide him notice of termination for cause and an opportunity to cure the same. Pomeroy instead argues that Martin was given notice in September 1997 that his job was in trouble; he received the resolution from the board of directors making his termination final; and the board determined his conduct would not be cured. Kentucky recognizes the doctrine of substantial compliance with the terms and provisions of a contract. *Shreve v. Biggerstaff,* 777 S.W.2d 616 (Ky.App.1989); *All States Investors, Inc. v. Bankers Bond Co.,* 343 F.2d 618 (6th Cir.1965). Whether Pomeroy's conduct in this case substantially complied with the employment agreement or amounted to a breach is for the jury to determine.

**C. Martin and Lanetca's motion for summary judgment on the non-competition agreement.**

█ Pomeroy claims that Martin's initiation of a new business to take over the JacqCAD distribution violated the non-competition agreement. Martin characterizes that business as a "spin-off" which only lasted a couple of weeks. Again, the issue is one for the jury.

Pomeroy also contends that Martin and Lanetca solicited other businesses on Pomeroy's premises. Martin and Lanetca claim, however, that Trend Knits was a "cut and sew" textile business and thus was not in competition with Pomeroy. And, Martin acknowledges he assisted in the start-up of Gestalt Technologies, Inc., a business to distribute software, but claims that because he had no financial interest, he did not violate the non-competition agreement. Whether the conduct related to these entities violated the agreement is an issue of fact for the jury.

**D. Other issues relevant to the trial.**

█ Although Pomeroy did not cross-move for summary judgment, it has noted that the promissory note contains a provision that any suit to enforce it must be brought in Ohio. Specifically, the note contains the following provision:

> The provisions of this Note and the obligations of the Borrower hereunder shall in all respects be governed by and interpreted and determined in accordance with the internal laws of the State of Ohio. BORROWER AND THE LENDER AGREE THAT ANY ACTION OR PROCEEDING COMMENCED BY OR ON BEHALF OF THE PARTIES

ARISING OUT OF OR RELATING TO THIS NOTE SHALL BE COMMENCED AND MAINTAINED EXCLUSIVELY IN THE DISTRICT COURT OF THE UNITED STATES OF THE APPLICABLE DISTRICT OF OHIO, OR ANY OTHER COURT OF APPLICABLE JURISDICTION LOCATED IN CINCINNATI, OHIO. **Amended and Restate Subordinated Promissory Note, at ¶ 9 (emphasis in original).**

Since its seminal decision in *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, [92 S.Ct. 1907, 32 L.Ed.2d 513] (1972), the Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity, rejecting the "parochial concept" that "notwithstanding solemn contracts ... all disputes must be resolved under our laws and in our courts." But the presumption of enforceability that forum selection and choice of law provisions enjoy is not absolute and, therefore, may be overcome by a clear showing that they are " 'unreasonable' under the circumstances." Choice of forum and law provisions may be found unreasonable if ... (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; ... or (4) their enforcement would contravene a strong public policy of the forum state.

*Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir.1996) (quoting *The Bremen*, 407 U.S. at 9, 10, 12–13, 92 S.Ct. 1907 and *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)). The issue here is whether it would be "unreasonable under the circumstances" to force Martin and Lanetca to litigate the issues involving the promissory note in Ohio, in essence bifurcating litigation that has been "hard fought" to the point of trial. *Falconwood Financial Corp. v. Griffin*, 838 F.Supp. 836 (S.D.N.Y. 1993). The undersigned concludes it would be unreasonable. Moreover, this litigation will constitute *res judicata* over

subsequent issues which may be litigated. It is appropriate to have the parties' disputes finally concluded in one litigation.

■ In *Martin v. Pomeroy Computer Resources, Inc.*, Civil No. 5:98cv16, Martin alleged a cause of action pursuant to N.C.Gen.Stat. § 95–25.1, *et. seq.*, North Carolina's Wage and Hour Act. The wording of the complaint is ambiguous and Pomeroy accurately notes that Martin appears to allege the right to recover future unearned wages. However, there is no such cause of action under the Wage and Hour Act which applies only to earned wages and benefits. *Narron v. Hardee's Food Sys.*, 75 N.C.App. 579, 583, 331 S.E.2d 205, 208 (1985) (**The Wage and Hour Act requires an employer "to pay those wages and benefits due when the employee *has actually performed the work required to earn them.*") (emphasis added).** Thus, to the extent Martin intends to assert such claims, they are hereby dismissed.

### E. Causes of action remaining for trial.

Because trial will involve three consolidated actions, and three complaints, the Court finds it appropriate to state its understanding of the claims and counterclaims remaining for trial. The parties will be given an opportunity to clarify this understanding.

In *Pomeroy Computer Resources, Inc. v. Martin and Lanetca, Inc.*, Civil No. 5:98cv108, Pomeroy alleges the following causes of action:

1. breach of the employment agreement against Martin;

2. declaratory judgment that it is not liable for further remuneration under the employment agreement because it terminated Martin for cause;

3. breach of the asset purchase agreement by Martin and Lanetca;

4. breach of the covenant not to compete agreement by Martin and Lanetca;

5. breach of fiduciary duties by Martin;
6. usurpation of corporate opportunities; and
7. tortious interference with contractual relationships.

The cause of action for usurpation of corporate opportunities is in actuality a second claim for breach of fiduciary duty. *See, e.g., Meiselman v. Meiselman,* 309 N.C. 279, 306, 307 S.E.2d 551, 567 (1983); *In re Silverman,* 155 B.R. 362 (Bankr. E.D.N.C.1993). Because the language alleged in Counts V and VI both relate to the failure to pursue corporate opportunities for Pomeroy, Pomeroy is asked to clarify whether there are two such claims or one. In response to the complaint, the Defendants counterclaimed to recover under the promissory note.

Because Pomeroy has asserted a declaratory judgment claim, it is necessary to ascertain the role of the jury at trial. The request for declaratory judgment relates only the issue of whether Martin was terminated for cause and therefore, Pomeroy is relieved of any obligations under the employment agreement. The Court proposes to submit an issue to the jury concerning whether that termination was for cause. Once that finding is made, the Court will undertake the declaratory judgment aspect in the final judgment.

In *Martin v. Pomeroy Computer Resources, Inc.,* Civil No. 5:98cv16, Martin has asserted two claims, one for wages and benefits pursuant to the North Carolina Wage and Hour Act and one for conversion of personal property. The Court is of the impression that the conversion claim has been resolved. Pomeroy asserted a counterclaim alleging the same causes of action stated above but seeking the additional relief of an accounting, an equitable remedy which will be addressed after trial.

In *Martin and Lanetca, Inc. v. Pomeroy Computer Resources, Inc.,* Civil No. 5:98cv33, Plaintiffs seek a declaration of the parties' respective rights under the asset purchase agreement, the employment agreement and the non-competition agreement. To the extent necessary, issues will be presented to the jury concerning facts on which the declaration of rights may be based. Pomeroy asserted counterclaims for fraudulent inducement and common law fraud.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Martin and Lanetca's motion for partial summary judgment is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the forum selection clause contained with the promissory note is unreasonable and therefore unenforceable; and

**IT IS FURTHER ORDERED** that the claim of Martin under the North Carolina Wage and Hour Act is limited to wages and benefits actually earned prior to termination; and

**IT IS FURTHER ORDERED** that the parties may file response to the Court's statement of the remaining causes of action on or before August 4, 1999.